**Dr. Gloria J. ROMERO, Willie E. White, Joseph Lee Duncan, Tomas Ursua, and Harold Webb, Plaintiffs,**

**v.**

**The CITY OF POMONA; G. Stanton Selby, Mayor of the City of Pomona; Vernon M. Weigand, Councilman District 1; E.J. Gaulding, Councilman District 2; Donna Smith, Councilperson District 3; Mark Nymeyer, Councilman District 4; all in their official capacities as members of the City Council of the City of Pomona, California, Defendants.**

No. CV 85–3359 JMI (Gx).

United States District Court, C.D. California.

July 20, 1987.

854

John E. Heurta, Gronemeier, Barker and Huerta, Pasadena, Cal., Antonia Hernandez, Linda J. Wong, Phil Trevino, Mexican American Legal Defense and Educational Fund, Los Angeles, Cal., for plaintiffs.

Rolando L. Rios, Jose Garza, San Antonio, Tex., William L. Garrett, Dallas, Tex., John E. McDermott, McDermott, Will & Emery, Los Angeles, Cal., for defendants.

Patrick J. Sampson, City Atty., William E. Dennis, Deputy City Atty., Pomona, Cal., for City of Pomona.

OPINION

IDEMAN, District Judge.

This matter is before the Court following a nonjury trial held on June 17, 1986 to June 24, 1986. After the close of plaintiffs' case-in-chief, the defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure 41(b). The Court directed the parties to submit briefs addressing the factual and legal issues raised. The briefs have been received and oral argument was heard thereafter. The matter is now ripe for decision.

The plaintiffs in this action are five hispanic and black residents of the City of Pomona, California. The defendants are the City of Pomona, and the five members of the Pomona City Council. The plaintiffs allege that the at-large system of electing members of the Pomona City Council unlawfully dilutes hispanic and black voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973. Further, they allege that the at-large system has been maintained for a racially discriminatory purpose in violation of their Fourteenth and Fifteenth Amendment rights and 42 U.S.C. § 1983.

The plaintiffs seek (1) a declaratory judgment that the at-large system of electing members of the Pomona City Council unlawfully dilutes hispanic and black voting strength; (2) an injunction prohibiting the holding of future City Council elections under the at-large system; and (3) the replacement of the at-large system with a plan whereby all five City Council members would be elected from wards or single-member districts.

A motion to certify this action as a class action was denied by Order of October 22, 1985.

The defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 41(b) is GRANTED based upon the following findings of fact and conclusions of law.

I. FINDINGS OF FACT

A. Introduction

The plaintiffs are Dr. Gloria J. Romero, Willie E. White, Joseph Lee Duncan, Tomas Ursua and Harold Webb. Dr. Gloria J. Romero and Tomas Ursua are hispanic, and Willie E. White, Joseph Lee Duncan, and Harold Webb are black. The defendants are the City of Pomona, and each of its five current City Councilmembers—G. Stanton Selby, Mayor of the City of Pomona; Vernon M. Weigand, Councilman District 1; E.J. Gaulding, Councilman District 2; Donna Smith, Councilperson District 3; and Mark Nymeyer, Councilman District 4. All present City Councilmembers are white. The City of Pomona is a municipal corporation organized and existing under the laws of the State of California.

According to the 1980 census, the City of Pomona has a total population of 92,742 persons, of whom 30.5% or 28,287 have hispanic surnames, 18.6% or 17,250 are black, and 46.7% or 43,318 are white. The remaining 4.2% are of other ethnic backgrounds. According to a 1984 update by the census bureau, the total population was 97,998 persons, of whom 30.5% or 29,889 were Spanish and 19% or 18,620 were black.

As of April 16, 1985, and according to the Los Angeles County Register of Voters, the total number of registered voters in the City of Pomona was 41,486. Voters of Spanish origin are identified by Spanish surname in accordance with the list of Spanish surnames provided by the census. The number and percentage of black registered voters is impossible to calculate because they are not identified as such on the voter registration rolls.

B. History of the Adoption of the
At-Large System

The City of Pomona was incorporated as a "general law" city in 1888. At that time, its local election system was mandated by state law. From 1888 to 1911, the method of electing the City Trustees (the equivalent of City Council Members) was controlled by the California Municipal Corporations Act of 1883. The Act required that the Board of Trustees consist of five members and that each be elected at-large.

In 1911, Pomona's electorate adopted Pomona's own City Charter, making Pomona

a "charter city" free to choose its own method of electing its governing body. The City of Pomona's 1911 Charter continued the 23 year old practice of electing five members to its governing body pursuant to at-large voting by providing for a City Council consisting of five councilmembers, one of whom was the Mayor, and each of whom was elected at-large.

The at-large election system contained in Pomona's 1911 Charter, which was mandated by then-existing state law for non-charter general law cities of Pomona's size, was a prominent feature of the progressive era. Under the 1911 Charter, the City was divided into four districts. Furthermore, except for the mayoral slot, the Charter has a residency requirement. It requires that each councilmember must reside in the district that he is running in and file for that designated post. The 1911 Charter also contains a "majority vote" requirement which provides that, to be elected, a candidate must receive the support of a majority of all of the voters of the city. If no candidate receives a majority of the votes in the primary election, then a run-off is held in the general election between the two candidates who received the most votes in the primary. The term of office for the mayor of Pomona is two years. The term of office for the other four councilmembers is four years. Elections for the four councilmembers are staggered, with races for two of the four seats alternately occurring in March and April of each odd-numbered year. Thus, every two years, the voters in Pomona are able to participate in the election of the mayor and two City councilmembers.

Since the institution of the at-large electoral system in 1888, two hispanics have been elected to the Pomona City Council. Bill Herrera was elected to the City Council in 1967, and Ben Ochoa was elected to the City Council in 1973 and 1977. A black has not been elected to the City Council. There have been eleven (11) blacks that have run for office in fourteen (14) campaigns, but they have been defeated in run-off elections. Monroe Jones was defeated in 1973 and Willie White in 1983. In both the 1965 and 1981 primary, Joseph Duncan, a Black, received the highest number of votes in his district, but lost city-wide. Since 1977, no minority has been elected to the Pomona City Council.

### C. The At-Large System to Date

A Charter Revision Committee was formed in 1963 to make recommendations concerning a new Charter for the City of Pomona. The Charter Revision Committee considered the question of whether Pomona councilmembers should be elected from wards or at-large. The Committee also considered whether Pomona should have five, seven or nine councilmembers. The recommendation of the Charter Revision Committee was to maintain the current at-large system of electing councilmembers with a geographic residency requirement. The Committee further recommended that the Council continue to consist of five councilmembers, one of whom would be the mayor. At least two Spanish-surnamed individuals were members of the Charter Revision Committee. These individuals were Candelario Mendoza and Manuel Jara. Mr. Mendoza served on the Charter sub-committee which unanimously recommended that the City maintain its at-large method of electing councilmembers. Mr. Jara also voiced his support for the at-large system.

In 1965, the voters of Pomona approved a new City Charter replacing the 1911 Charter, as amended. The new Charter incorporated many of the recommendations of the Charter Revision Committee, including the retention of a five person City Council to be elected at-large. In 1971–1972, the Pomona City Council considered the question of whether to adopt a ward system for electing city councilmembers. In 1972, the voters of Pomona, by a vote of 13,701 to 11,891, rejected the substitution of a ward system for its at-large method of electing City Council members.

The at-large election system continues to be in effect today.

### D. The Thornburg v. Gingles Requirements

In *Thornburg v. Gingles*, —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the United States Supreme Court construed,

for the first time, Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982, 42 U.S.C. § 1973. In determining whether voter dilution has occurred, the Court held that the minority plaintiff must meet three preconditions to show that an at-large election system, as in the instant case, can be held to be dilutive of the right of any citizen of the United States to vote. The plaintiff must prove geographic compactness, political cohesiveness, and racial bloc voting to show that an at-large election system violates Section 2 of the Voting Rights Act.

### 1. Geographic Compactness

A minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district.[1] A single-member district includes only those individuals who are eligible to vote. The defendants contend that the hispanics and blacks do not vote as one cohesive group and therefore must be considered separately in determining whether each is a sufficiently large and geographically compact group. As will be discussed, the Court finds that the hispanics and blacks do not vote as a cohesive group. Consequently, each group must be considered separately in determining the issue of geographic compactness.

Unlike heavily segregated Southern cities, the City of Pomona is very "integrated" as described by plaintiff, Tomas Ursua, thereby making it impossible to draw a "safe" district for either hispanics or blacks. Furthermore, in comparison to their respective populations, both hispanics and blacks have a higher proportion under the voting age of 18 than do whites. For example, in 1985, hispanics represented 30–50% of the total population but only 25% of the voting age population. Blacks represented 19% of the total population but only 16.2% of the voting age population. Finally, many hispanics are not citizens and therefore are ineligible to vote. Plaintiffs'

expert, Dr. Garcia, testified that 37% of all hispanics in California are foreign-born and, of that number, about 30% are naturalized citizens. Consequently, roughly a quarter of all hispanics are ineligible to vote and therefore the eligible hispanic voting age population is less than 20% of the total eligible voting age population in the City of Pomona.

The record of the past elections is a persuasive factor in support of the contention that minority dispersion makes it impossible to draw a "safe" hispanic or black district. For example, in 1965 and 1981, Joseph Duncan, a black, won his district but lost citywide. In both elections, however, there were numerous candidates (nine and six respectively) and Joseph Duncan actually received only a small share of the total votes cast, both citywide and in his own district. In 1973, hispanic candidate Ben Ochoa won citywide against a white opponent but lost his district in both the primary and general election. Therefore, Mr. Ochoa would not have been elected under a district system.

The Court finds that if Pomona's at-large election system was dilutive of concentrated minority voting strength, there should be repeated instances of minority candidates winning their districts, but losing citywide. The fact that no such pattern exists demonstrates that minority voters are neither very large nor very concentrated. The Court finds that it is questionable and speculative as to whether a district system would improve the electability of minority candidates in comparison to the current at-large system.

To further demonstrate geographic compactness, plaintiffs offered three proposed district plans as remedies if a voting rights violation existed. The Court finds that even if total population figures are used in the plans, the plaintiffs' proposed plans do not demonstrate geographic compactness when factors of age and citizenship are considered.[2]

---

**1.** *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 2767, 92 L.Ed.2d. 25 (1986).

**2.** The plaintiffs' expert, Dr. Robert Brischetto, testified that when the eligible voting age population is considered, none of the districts in plaintiffs' proposed district plans have a majority hispanic or black population.

Plaintiffs' proposed 4–1 district plan, which utilizes much smaller and more numerous precincts than those utilized by the City, does not contain any districts with a majority black population (the most in any district is only 39%—District A) and only one district in which a bare majority (51%) of the total population is hispanic (District C). Nonetheless, neither this hispanic district nor the combined majority percentage of minorities in districts A and C constitute an effective voting majority because neither considers the voting eligibility factors of age or citizenship.

Plaintiffs' proposed 6–1 plan also does not contain any districts with a majority black population. The most in any district is 40% (District A). Only one district contains a majority hispanic population (District C). Again, however, district C and the combined percentage of the minority groups, does not take into consideration voting eligibility factors.

Plaintiffs' proposed 8–1 plan has one district with a 51% black population (District A) and one district with a 60% hispanic population (District C). However, after consideration of the age and citizenship voting eligibility factors, none of the eight districts has a majority of either hispanic or black voters.

Finally, the Court finds that evidence of the City of Pomona's integration lies in plaintiffs' homogeneous precincts analysis. The analysis indicates that, in 1985, out of 25 precincts, none had over a 60% hispanic population. Most of the concentrated black precincts were only 62% black. Moreover, despite the fact that there were only three (3) precincts that exceeded the 70% minimum population when hispanics and blacks were combined, the numbers decreased if age and citizenship were factored into the eligible voting age percentage for each ethnic group in each precinct.

The Court finds that geographic compactness is non-existent in the City of Pomona, regardless of whether the hispanics and blacks are treated separately or together. After taking into consideration factors such as eligible voting age and citizenship, the evidence conclusively establishes that neither hispanics nor blacks can constitute a majority of the voters of any single member district. Furthermore, the history and present status of the at-large system reflects the desire of the electorate to maintain such a system.

### 2. Political Cohesiveness

The plaintiffs contend that they are a politically cohesive group. However, the exit poll survey by plaintiffs' expert, Dr. Robert Brischetto, demonstrates to the contrary. The exit poll involved a survey of voters as they left the polling places on March 5, 1985. The interviewers were stationed at 19 of the 24 polling places. They asked voters leaving the polling places to fill out an anonymous questionnaire indicating how they voted and to provide them with certain characteristics about themselves (i.e. age, ethnicity, gender, party preference and income). In some cases, voters were interviewed, but informed that their responses were confidential. By analyzing responses to the voting questionnaire according to race or ethnicity, the Court is able to determine whether cross racial support between hispanics and blacks exists. The Court finds that the exit poll survey is a reliable method for determining whether political cohesiveness exists. However, despite Dr. Robert Brischetto's findings, the survey results demonstrate that during the March, 1985 primary election, 71% of the Hispanics voted for the white opponents of Joseph Duncan, the black candidate for district 2. Furthermore, in that same election, 60% of the black voters voted for the white opponents of Tomas Ursua, the hispanic candidate for Council District 3, and a plurality of voters preferred victorious candidate Donna Smith, who is white. Therefore, the Court finds that hispanics and blacks in Pomona are not politically cohesive. Although the hispanics and blacks may provide some cross-racial support, the Court finds that the present at-large election system of the City of Pomona does not in any way preclude a minority candidate from a successful election.

### 3. Bloc Voting

The Court defines racially polarized voting as a consistent relationship between the race of the voter and the way in which he votes. The plaintiffs and the defendants each offered their own method for determining the existence of racially polarized voting. The plaintiffs contend that racially polarized voting can be determined by a bivariate analysis. Under a bivariate analysis, race is the only variable considered. Conversely, the defendants contend that a multivariate analysis should be utilized. Under a multivariate analysis, other reasons in addition to race are considered.

The Court accepts the method used by the plaintiffs to determine racially polarized voting and rejects defendants' method. The Court finds that the use of a bivariate analysis is the proper procedure for determining voter dilution in the City of Pomona. Furthermore, plaintiffs' method is consistent with the method recently adopted by the United States Supreme Court.[3] Therefore, the Court will employ plaintiff's method in determining whether the Pomona City council elections may be characterized as racially polarized.

The plaintiffs offer three (3) methods to measure whether voting is polarized along racial lines. The three methods are: (a) homogeneous precinct analysis; (b) ecological correlation and regression analysis; and (c) exit poll survey.

#### a. Homogeneous Precinct Analysis

Plaintiffs' homogeneous precinct analysis is based solely on census population data. The census data is based upon race. In a homogeneous precinct analysis, only those precincts with 90 to 100% of one race are considered to estimate how other members of that race, located elsewhere in other precincts of the city, vote in a particular election. The Court finds that the plaintiffs' homogeneous precinct analysis presents problems.

First, due to the dispersion of hispanics and blacks throughout the City of Pomona, there are no homogenous precincts that are over 90% white, hispanic, or black. The further one gets from 100% homogeneous precincts, the more difficult it becomes to reliably estimate the race of the voter or the identity of the candidate supported by that voter. For example, if a precinct is 40% white and 60% hispanic and 50 of the 100 voters vote for the hispanic candidate, there is no way of ascertaining the race of the 50 voters. Therefore, the Court is unable to determine whether the voting of hispanics and whites is polarized.

Second, the ethnic composition of the precincts is based on census information and not on actual voter lists. Dr. Robert Brischetto testified that he would have preferred actual lists in conducting his homogeneous precincts analysis.

Third, the percentage of votes cast for each candidate does not indicate the ethnicity of the people who actually voted. Dr. Brischetto assumed that if the precinct was homogeneous in terms of population, then it was also homogenous with respect to voters. For example, in the 1983 Primary, City Council District 1, precinct number 6, 70% of the precinct population voted for a white candidate and 30% voted for a hispanic candidate. However, the 70% figure cannot be further broken down to reveal which percentage of the 70% was white, hispanic or black. Therefore, the Court finds that the homogeneous precinct analysis does not present a showing of voting along racial lines. The method poses problems which preclude plaintiffs from effectively and accurately showing the existence of polarization.

#### b. Ecological Correlation and Regression Analysis

The ecological correlation and regression method involves an analysis of official precinct returns for elections in which minority group candidates ran against non-minority group candidates. Dr. Robert Brischetto used two types of data for this approach: a measure of the independent variable—the race of voters in each precinct, and a measure of the dependent variable—the election returns by candidates in each precinct.

---

**3.** *Thornburg v. Gingles,* 106 S.Ct. at 2773.

The method of analyzing precinct returns to determine whether there is a pattern of racially polarized voting is referred to by statisticians as the "ecological correlation and regression analysis." The ecological correlation refers to the fact that the data returns are based on local area units or voting precincts. The correlation coefficient is a measure of the extent to which there is a consistent pattern in the relationship between, in this case, for example, the percent of voters casting ballots for a hispanic candidate and the percent of voters in the precinct who are Spanish surnamed. The correlation coefficient ("r") may range in magnitude from 0 to 1. Its sign may also be either positive or negative. A zero correlation indicates that there is no relationship between the independent and dependent variables; an "r" of 1.0 indicates that there is a perfect correlation. If "r" is squared, there is a measure of the proportion of variation in voting. This is explained by the ethnic composition of the precinct which is referred to as the coefficient of determination.

Essentially, ecological correlation and regression analysis examines all precincts, and then determines whether, as a precinct becomes increasingly concentrated with voters from one race, the vote for candidates of that same race increases. Since the Court has elected to treat the hispanics and blacks separately, plaintiffs' ecological correlation and regression analysis presents problems.

The plaintiffs' expert, Dr. Brischetto, testified that the lack of cross-racial support for candidates is concealed in the correlations because the totals presented combined hispanic and black voters. For example, Dr. Brischetto testified that there was a "very strong" correlation of .90 between the percentage of minority population in a precinct and the percentage of voters in a precinct voting for Tomas Ursua in the 1985 primary elections. Yet, another analysis performed by Dr. Brischetto, which was obtained through discovery but not offered by plaintiffs, showed that the correlation between the percentage of peo-

ple with a Spanish surname in a precinct and the percent voting for Tomas Ursua to be only .64. This means that the addition of a black population to the precincts pushed the correlation from .64 to .90 when both hispanics and blacks were included. Therefore, the Court finds that the plaintiffs' ecological correlation and regression analysis poses methodological problems which prohibit the Court from accurately finding the existence of polarized voting.

### c. Exit Poll Analysis

The Court finds that Dr. Brischetto's exit poll survey is the most reliable method for determining racial polarization. The exit poll permits the Court to examine directly how voters voted and which candidates were in fact preferred by minority voters. Most importantly, the survey enabled the Court to determine which candidates were preferred by hispanics and blacks when treated separately. As discussed, plaintiffs' exit poll revealed that there is very little cross-racial support. Accordingly, the Court finds that the City of Pomona's present at-large election system does not create racially polarized voting.

### E. Application of the Senate Factors

The Court concurs with the United States Supreme Court in *Thornburg v. Gingles* that the application of the Senate Factors is not *essential* to a minority voter's dilution claim.[4] The Court finds that the plaintiffs have not satisfied the three preconditions set forth in the *Thornburg* case. Nevertheless, even if the Court were to consider the Senate Factors, a showing of dilution in the City of Pomona is non-existent. The Court finds that explanations, other than race, for the defeat of minority candidates prohibits a finding that the City of Pomona's present at-large election scheme unlawfully dilutes the voting rights of the hispanics and blacks.

First, hispanics have been elected three times to the Pomona City Council: Bill Herrera in 1967 and Ben Ochoa in 1973 and 1977. Hispanics have been represented on the City Council for 12 of the past 19 years. The overall success rate of hispanic candi-

4. *Id.* at 2766, n. 15.

dates for the period from 1965–1985 was 33%, compared to a success rate of only 27.7% for white candidates. Black voters preferred victorious candidate Donna Smith to Tomas Ursua in the 1985 primary, and in that same election an overwhelming majority of hispanics preferred Joseph Duncan's opponents. Although no black has been elected to the Pomona City Council, in 1983 black candidate Willie White, despite the small size and dispersion of the black community in Pomona, lost by only 71 votes. His near miss, which could not have been achieved without substantial white crossover support, demonstrates the potential electability of black candidates. Two hispanics and blacks have been elected to the local school board, which has nearly identical boundaries with the City of Pomona.

Second, the campaign strategies of various minority candidates affected their potential for election to the city council. Willie White's campaign manager conceded that White's campaign organization failed on election day. The campaign workers were overconfident because Willie White had won the primary by 700 votes and therefore did not show up on election day to get out the vote or went home early before the polls closed. Moreover, the citizens supporting Willie White did not vote because they thought he had victoriously secured his election. Consequently, Willie White would have won if his own campaign organization had worked harder and had not been so presumptuous about his victory. Also, White's opponent was aided by endorsements from the two losing primary candidates and from the local newspaper. Willie White stated that race was not an issue in the election.

In the 1985 election, candidate Tomas Ursua was only 29 years old. He recently had returned to Pomona. Prior to his return, he had never lived in his Council District. Further, he testified that he "was never really all that interested in the local electoral scene,"; had never before been involved in any candidate election campaign and had a campaign manager (his wife, plaintiff Dr. Gloria Romero) who had never served before in that capacity. He also avoided campaigning in the white community. Finally, Tomas Ursua's opponent was a candidate who had been endorsed by the newspaper and whose campaign consultant was former two-term hispanic Council member Ben Ochoa. Therefore, the campaign strategies, the lack of community involvement, the inexperience and lack of skill on the part of campaign managers, and the endorsement of opponents suggests that other candidates preferred by hispanic or black voters might attract greater white support in future elections.

Third, evidence regarding any history of past discrimination in California and in the City of Pomona touching upon the right of minorities to register, to vote, or otherwise to participate in the political process have been mitigated by intensive efforts of the California Legislature to improve minority voting participation and to liberalize the political process. The State of California and the City of Pomona provide easy access for any individual to be nominated as a candidate for the Pomona City Council. In order to be nominated, an individual need only be a citizen of the United States, a qualified elector of Pomona for 29 days prior to the Primary election and a resident of the councilmanic district in which the candidate is nominated. The candidate need only obtain 20 to 30 Pomona voters' signatures on his nomination papers to run in the Primary Election.

Furthermore, California and Pomona provide open access to voter registration. Any United States citizen who is 18 years of age and a resident of California may register to vote at least 29 days prior to the election. The registration can be accomplished by mail and at no cost to the voter. California and Pomona do not require that an individual reregister if that individual fails to vote in an election. Finally, California and Pomona provide open access to voting. Specifically, California makes absentee voting available to any registered voter for any reason. Additionally, an individual may apply by mail to vote absentee. California also provides bilingual ballots in areas with non-English speaking voters such as the City of Pomona.

Plaintiffs criticized the City Clerk's handling of the 1985 Ursua primary election. However, plaintiffs' witnesses admitted that past elections had been conducted in an excellent manner, none had ever encountered any difficulty in registering to vote or voting, the City Clerk was not racially biased and hispanic turnout was greater in that election than white turnout. Furthermore, although there have been few hispanic or black election inspectors and judges in the past, the Court finds that in the case of nomination, registration and voting, combined with hispanic turnout equal to or greater than white turnout and the record on election outcomes, it does not appear that, overall, minorities have less opportunity to participate in the political process. The City of Pomona does not utilize any electoral devices that enhances the opportunity for discrimination against minorities or allows a white voting bloc usually to defeat minority candidates.

Fourth, Pomona does not have a designated or numbered post requirement or any prohibition against bullet voting. Although Pomona does have a majority vote requirement, it has not had an adverse impact on minority candidates running for the Pomona City Council. Bill Herrera won the primary in 1967 but lost the run-off. In 1973, Ben Ochoa *lost* the primary but *won* the run-off, while Willie White won the priminary in 1983 but lost the run-off.

Plaintiffs' own expert admitted that Pomona's staggered term election procedures have not had an adverse impact on minority candidates for the City Council. Finally, there is no candidate slating process in Pomona, nor have minorities been denied access to the process of nominating candidates, or of being nominated as a candidate, to the Pomona City Council. The political campaigns in Pomona have not been characterized by racial appeals. Plaintiffs Joseph Duncan and Tomas Ursua admitted that they never heard any racial appeals during their campaigns.

Finally, the City Council and the City government of Pomona are responsive to the needs of racial minorities. Dr. Mendo-za testified that the City of Pomona makes every effort to provide services equally to all citizens regardless of race, color or creed. Accordingly, the Court finds that the City of Pomona's present at-large election system does not dilute the voting rights of the hispanics and blacks and therefore does not violate the Voting Rights Act. The hispanic and black community is very integrated. Moreover, the at-large system does not result in racial bloc voting. Therefore, the Court finds that the plaintiffs have not proven a voting rights violation.

## II. CONCLUSIONS OF LAW

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202, and 42 U.S.C. § 1973j(f).

Federal Rule of Civil Procedure 41(b) provides in pertinent part:

(b) INVOLUNTARY DISMISSAL: EFFECT THEREOF....

After the plaintiff, in an action tried by the Court, without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law, the plaintiff has shown no right to relief. The Court, as trier of the facts, may then determine and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

In *Wilson v. United States*, 645 F.2d 728, 730 (9th Cir.1981) the Court, quoting from Moore's Federal Practice stated:

This role of the court [in granting a Rule 41(b) dismissal] is quite different than [its role in directing a] verdict in a jury case where the judge is not the trier of the facts and cannot make the factual determination. In the court case, however, since the judge is the trier of the facts he may weigh and consider the evidence and sustain defendant's motion though plaintiff's evidence establishes a prima facie case that would have preclud-

ed a directed verdict for defendant in a jury case.

5. Moore's Federal Practice ¶ 41.13[4] at 41–193 through 94 (2nd ed. 1980); (additional citations omitted). The findings of fact that Rule 41(b) requires the judge to make may not be reversed on appeal unless clearly erroneous. *Moore v. City of San Jose,* 615 F.2d 1265, 1273 (9th Cir.1980); *Wilson v. United States,* 645 F.2d at 730. Therefore, the Court may dismiss an action pursuant to Federal Rule of Civil Procedure 41(b) even if the plaintiff has made out a prima facie case, for as the trier of fact, the judge need only reach the conclusion that the evidence preponderates against plaintiff. *See Ellis v. Carter,* 328 F.2d 573, 577 (9th Cir.1964).

A. *Thornburg v. Gingles Requirements*

■ Generally, at-large methods of electing legislative bodies are not unconstitutional per se. *Rogers v. Lodge,* 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012, *reh'g denied,* 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 160 (1982). The Constitution does not create any right in favor of an ethnic minority group to proportional representation in any legislative body. *City of Mobil v. Bolden,* 446 U.S. 55, 75–76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47 (1980). These competing legal principles are directly involved in this case.

Recently, in *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the United States Supreme Court was required to construe, for the first time,

Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982, 42 U.S.C. § 1973. The specific question to be decided was whether the three-judge District Court, convened in the Eastern District of North Carolina pursuant to 28 U.S.C. § 2284(a) and 42 U.S.C. § 1973(c), correctly held that the use of multimember districts in a legislative redistricting plan in five North Carolina legislative districts violated Section 2 by impairing the opportunity of black voters to participate in the political process and to elect representatives of their choice. Section 2(b), 96 Stat. 134.

Through its holding in *Thornburg,* the Court held that while many or all of the Senate Report factors may continue to be relevant to a claim of minority vote dilution, a minority plaintiff must meet three preconditions to show that an at-large election system, as in the instant case, can be held to be dilutive of the right of any citizen of the United States to vote. These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. *Id.* at 2765–66.

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district (footnote omitted).[5] If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates. *Id.* at 2766 (footnote and citations omitted).[6]

---

5. In the instant case, the defendants allege that the lack of concentration of minority groups in the City of Pomona supports the fact that Pomona's at-large system does not dilute the voting rights of the hispanics and blacks.

6. The United States Supreme Court noted:

The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate

standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. As two commentators have explained, "To demonstrate [that minority voters are injured by at-large elections], the minority voters must be sufficiently concentrated and politically cohesive that a putative districting plan would result in districts in which members

Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. *Id.* at 2767 (citations omitted).

Third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Id.* (citations omitted). In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

### 1. Geographic Compactness

*The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.*

■ The law is clear that if the minority group is not sufficiently large and geographically compact then the minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. *Id.* Furthermore, more than a bare majority of minority voters is needed to constitute an effective voting majority in a single-member district. *Kirksey v. Board of Supervisors of Hinds County Mississippi*, 554 F.2d 139, 150 (5th Cir.) (en banc) *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Moreover, only those individuals eligible to vote can be counted in determining whether a minority group can constitute a voting majority of a single-member district.

■ The Court has found that the hispanics and blacks are not a politically cohesive group. Consequently, the Court will treat the hispanics and blacks separately in

determining the existence of geographic compactness. The plaintiffs' proposed district plans, when treating the hispanics and blacks separately or together, do not demonstrate geographic compactness when the voting eligibility factors of age and citizenship are considered.

■ The Court concurs with the defendants' contention that the Court lacks the authority to dramatically increase the size of the present five-member Pomona City Council by 40 percent or 80 percent as suggested in the plaintiffs' proposed 6–1 and 8–1 district plans. *See Chargois v. Vermilion Parish School Board*, 348 F.Supp. 498, 500 (W.D.La.1972). The 6–1 and 8–1 plans also violate the one man-one vote principal. *See Reynolds v. Sims*, 377 U.S. 533, 567–68, 84 S.Ct. 1362, 1384–85, 12 L.Ed.2d 516, *reh'g denied*, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). The United States Supreme Court has ruled that any deviation exceeding 10% is a prima facie violation of the one man-one vote principal, creating a burden on the jurisdiction to justify the deviation. *Brown v. Thompson*, 462 U.S. 835, 842, 43, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983). However, the resulting justification cannot be for the reason of enhancing the political strength of a particular group. *Sims*, 377 U.S. at 577, 84 S.Ct. at 1389.

### 2. Political Cohesiveness

*The minority group must be able to show that it is politically cohesive.*

The defendants contend that the hispanics and blacks vote differently from each other and therefore they are not politically cohesive. Plaintiffs' exit poll survey demonstrates that hispanics and blacks provide little cross-racial support. Furthermore, both hispanic and black voters were divided in their support for their own candidates and white candidates.

of a racial minority would constitute a majority of the voters, whose clear electoral choices are in fact defeated by at-large voting. If minority voters' residences are substantially integrated throughout the jurisdiction, the at-large district cannot be blamed for the defeat of minority-

supported candidates.... [This standard] thus would only protect racial minority votes from diminution proximately caused by the districting plan; *it would not assure racial minorities proportional representation.*" *Id.* at 2766–67 (citation omitted).

Additionally, plaintiffs' use of both official precinct returns and economic correlation and regression analysis suffered methodological problems. With the official precinct returns analysis, the Court could not reliably estimate the race of the voter or the identity of the candidate supported by that voter. No correlation could be made regarding hispanic and black support for a hispanic candidate and vice-versa, because plaintiffs' expert, Dr. Brischetto, presented totals to the Court that combined the votes of hispanics and blacks. With the ecological correlation and regression analysis, the ecological correlations showed that as the percentage of hispanic voters increased, there was no increase in the support for a black candidate. Moreover, there was no increase in the percentage voting for hispanics as the percentage of black voters increased. Consequently, it cannot be determined from the ecological correlation and regression analysis that cross racial support exists. Therefore, plaintiffs have not presented evidence to show the existence of political cohesiveness between the hispanics and blacks.

### 3. Racial Bloc Voting

*The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.*

The Senate Report states that the extent to which voting in the elections of the state or political subdivision is racially polarized, S.Rep. No. 97-417, 97th Cong., 2d Sess. 29, U.S.Code Cong. & Admin.News 1982, pp. 177, 206, is relevant to a vote dilution claim. However, the existence of racially polarized voting is the keystone of a dilution claim. *See United States v. Marengo County Comm'n,* 731 F.2d 1546, 1566 (11th Cir.1984).

Racial polarization is defined as a consistent relationship between [the] race of the voter and the way in which the voters vote, or to put it differently, where black voters and white voters vote differently. *Thornburg v. Gingles,* 106 S.Ct. at 2768, n. 21 (citation omitted). The purpose of inquiring into the existence of racially polar-

ized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. *Id.* at 2769. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. *Id.* A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, (citations omitted), and consequently, establishes minority bloc voting within the context of Section 2. Generally, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. *Id.* at 2770 (citation omitted).

In *Thornburg v. Gingles,* the Court was divided in determining whether the proper procedure for analyzing polarization would be a bivariate analysis (where race is the only variable) or a multivariate analysis (where numerous reasons for an individual to support a candidate are considered). In the Brennan Opinion, joined in by Justices Marshall, Blackmun, and Stevens, Justice Brennan held that the bivariate analysis is proper in determining racially polarized voting. For purpose of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of the voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates. *Id.* at 2773 (citation omitted). Therefore, under § 2, only the correlation between the race of voter and the selection of certain candidates, not the causes of the correlation, matters. *Id.* It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred candidates. *Id.* Furthermore, under § 2, it is the status of the candidate as the chosen representative of a

particular racial group, not the race of the candidate, that is important. *Id.* at 2776.

Conversely, Justice O'Connor, in her concurring opinion, joined by Chief Justice Burger, Justice Powell, and Justice Rehnquist, held that evidence that the divergent racial voting patterns may be explained in part by causes other than race is relevant to the overall vote dilution inquiry. *Id.* at 2792. Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections. *Id.*

Although Justice White disagreed with Part III-C of Justice Brennan's plurality opinion regarding the application of a bivariate analysis to voter polarization, Justice White's only disagreement with Justice Brennan was whether the race of the candidate is relevant in measuring racial bloc voting. Justice White did not expressly disagree with Justice Brennan on the plurality's rejection of the necessity of using a multivariate analysis.

■ The Court has adopted the method used by plaintiffs in determining racially polarized voting. The Court concludes that a bivariate analysis is appropriate in determining racially polarized voting. Even under Justice O'Connor's reasoning, there would be no requirement that plaintiffs produce a multivariate analysis to prove racial bloc voting, a showing of a correlation between the race of the voters and the candidate selected would be sufficient.

The Court has found that the plaintiffs' evidence negates the existence of racially polarized voting in the City of Pomona. Except for the exit poll, plaintiffs' polariza-

tion evidence is flawed. Their homogenous precincts analysis is inappropriate because, due to the dispersion of minorities throughout the City of Pomona, there are no homogenous precincts that are 90 to 100% of one race. Additionally, the absence of any indication as to the race of the voter precluded the Court from determining whether there was polarized voting. The plaintiffs' ecological correlation and regression analysis demonstrates that as the percentage of hispanic voters increases in a district, there is no increase in the support of the black candidate. Furthermore, there is no general increase in the support of hispanic candidates as the percentage of black voters increase in a district. Finally, plaintiffs' exit poll survey demonstrates that Blacks favored Donna Smith, a white candidate, over Tomas Ursua in 1985. In that same election, a majority of minorities favored Ursua's opponents and the overwhelming majority of Hispanics favored Duncan's opponents. Under the bivariate analysis, the City of Pomona's electorate is not racially polarized.

B. *Statutory Claim Under Section 2 of the Voting Rights Act*

■ Congress' primary objective in amending Section 2 was to provide a remedy for racial vote dilution that is not necessarily the product of intentional racial discrimination.[7] While a voting practice that was adopted or has been maintained for racially discriminatory reasons would violate Amended Section 2, a voting practice that results in racial vote dilution also would violate Section 2 regardless of the intent of the defendants. S.Rep. No. 417, 97th Cong., 2d Sess. 2, *reprinted in* 1982

---

7. Section 2 as amended in 1982 provides:

(a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizens of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political

subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. 42 U.S.C. § 1973 (Supp.1986).

U.S.Code Cong. & Admin.News 177, 179; *See also White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Jordan v. City of Greenwood,* 711 F.2d 667, 668–69 (5th Cir.1983). The results test focuses on objective factors concerning the totality of circumstances bearing on the present ability of minorities to effectively participate in the political process.

To establish a violation of Section 2, plaintiffs may show a variety of factors in an attempt to prove their case. The Senate Committee on the Judiciary identified the following factors as relevant to the Section 2 "totality of circumstances" inquiry:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. S.Rep. No. 417 at 28–29 (footnotes omitted), U.S.Code Cong. & Admin.News 1982 p. 206–207.

Two additional factors listed in the Senate Report as having probative value are:

1. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

2. whether the policy underlying the state or political subdivision's use of such voting qualification as a prerequisite to voting, or standard practice or procedure is tenuous. *Id.*

Congress did not intend these factors "to be used [ ] as a mechanical 'point counting' device." S.Rep. No. 417, *supra,* at 29, n. 118, U.S.Code Cong. & Admin.News 1982, p. 207, n. 118. Nor is there a requirement "that any particular number of factors be proved or that a majority of them point one way or the other." *Id.* at 29, U.S.Code Cong. & Admin.News 1982, p. 207. Rather, evidence about these and other relevant factors is intended as a guide for the court's exercise of its judgment about whether "the electoral system, in light of its present effects and historical context, treats minorities so unfairly that they effectively lose access to the political processes. *Johnson v. Halifax County,* 594 F.Supp. 161, 169 (E.D.N.C.1984) (citation omitted).

▮ In *Thornburg v. Gingles,* 106 S.Ct. 2752, at 2765–66, the Court held that "[w]hile many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the uses of multimember districts generally will not impead the ability of minority voters to elect representatives of their choice."[8] The Court concurs with the ma-

---

**8.** The United States Supreme Court noted:
Under a "functional view" of the political process mandated by § 2, S.Rep. at 30, n. 120, U.S.Code Cong. & Ad.News 1982, p. 208, the most important Senate Report factors bearing on § 2 challenges to multimember districts are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Id.,* 28–29, U.S.Code Cong. & Ad.News 1982, p. 206. If present, the other

jority in *Thornburg* regarding the application of the Senate factors in determining a § 2 violation. The Court concludes that the Senate Factors are supportive of, but not essential to, a minority voter's dilution claim.

In light of the foregoing, the Court has found that, even if the Senate Factors were applied, the City has not used any of the enumerated voting practices or procedures to discriminate against hispanic or black voters. The plaintiffs evidence demonstrates that campaign management, racial appeals, and status of the candidate were primary factors in the success of a hispanic or black candidate. Most importantly, the electorates desirability to maintain an at-large voting system, despite proposals to convert the electoral system to a ward system, strongly convinces the Court that the voters in the City of Pomona do not perceive such a system as interfering with their ability to participate in the electoral process.

### C. Statutory Claim Under 42 U.S.C. § 1983

 Pursuant to Section 1983, "[e]very person who, under color of any statute, ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

The Court concludes that the plaintiffs presented no evidence to demonstrate that a hispanic or black citizen was prevented from registering to vote. The plaintiffs have failed to show that, as a result of the City of Pomona's at-large electoral system, any citizen has been deprived of his or her right to vote because of his or her race.

### D. Constitutional Claims

Under Section One of the 14th Amendment, "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or due process of law; nor deny to any person within its jurisdiction the equal protections of the laws." The plaintiffs have the burden of proving that:

(1) the challenged procedure was adopted and or maintained with the intent of purposefully discriminating against the minority voters; and

(2) the challenged election procedures result in diluting minority votes. *Rogers v. Lodge,* 458 U.S. 613, 617, 102 S.Ct. 3272, 73 L.Ed.2d 1012, *reh'g denied,* 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 160 (1982). Discriminatory intent may be "inferred from the totality of the relevant facts." *Id.* at 618, 103 S.Ct. at 3276, *quoting Washing-*

---

factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists—for example anti-bullet voting laws and majority vote requirements, are supportive of, but *not essential to,* a minority voter's claim.

In recognizing that some Senate Report factors are more important to multimember district vote dilution claims than others, the Court effectuates the intent of Congress. It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect." § 2(b). And, where the contested electoral structure is a multimember district, commentators and courts agree that in the absence of significant white bloc voting it cannot

be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. (citations omitted). Consequently, if difficulty in electing and white bloc voting are not proven, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates. Minority voters may be able to prove that they still suffer social and economic effects of past discrimination, that appeals to racial bias are employed in election campaigns, and that a majority vote is required to win a seat, but they have not demonstrated a substantial inability to elect caused by the use of a multimember district. By recognizing the primacy of the history and extent of minority electoral success and of racial bloc voting, the court simply requires that § 2 plaintiffs prove their claim before they may be awarded relief. *Id.* at 2766.

*ton v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976).

Under the 15th Amendment, the right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude. The present standard governing a challenge to an election procedure under the 15th Amendment is the same as applied to the 14th Amendment except that the 15th Amendment is not relevant to a question of ethnic vote dilution unless the claim concerns the purposeful denial of minority rights to register to vote and cast ballots. *City of Mobile v. Bolden,* 446 U.S. 55, 65, 100 S.Ct. 1490, 1498, 64 L.Ed.2d 47 (1980).

Furthermore, racial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and Fifteenth Amendments to occur. *Valasquez v. City of Abilene,* 725 F.2d 1017, 1022 (5th Cir.1984); *See Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

The plaintiffs have failed to present any evidence demonstrating that the City of Pomona's at-large electoral system was adopted for a discriminatory purpose. Plaintiffs' witness, Mr. Mendoza, who was a member of the 1963–65 Charter Revision Committee, testified that he had no knowledge of any intent to discriminate against minorities in the continued use of the at-large electoral system approved by the voters in their adoption of the 1965 charter. The at-large election scheme was mandated by a California statute which existed when the City of Pomona was incorporated. Despite a referendum for a proposed ward system in 1972, the citizens of Pomona again selected an at-large election system. There were very few minorities in Pomona when the citizens voted to maintain the at-large election system. Therefore, the preponderance of the evidence presented establishes that the method by which the City of Pomona elects its officials does not violate the 14th and 15th Amendments.

### III. CONCLUSION

Based on the foregoing findings of facts and conclusions of law, the Court holds that plaintiffs have failed to satisfy the three preconditions set forth in *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Furthermore, the Court holds that, after examining the totality of the circumstances, Pomona's at-large system for the election of City Council members would not violate Section 2 of the Voting Rights Act or the United States Constitution. The defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 41(b) is GRANTED. Accordingly, the Clerk is directed to enter judgment in favor of the defendants and against the plaintiffs on all their claims for relief.

IT IS SO ORDERED.