Andrea SKOREPA, on behalf of herself and all others similarly situated, Plaintiff,

v.

CITY OF CHULA VISTA; Chula Vista Mayor Gregory R. Cox; Gail McCandliss, Chula Vista City Councilmember; David Malcolm, Chula Vista City Councilmember; Leonard Morre, Chula Vista City Councilmember; Tim Nader, Chula Vista City Councilmember; Jeannie Fulasz, Chula Vista City Clerk; and Does 1 through 200, inclusive, Defendants.

No. 88–0464–R(M).

United States District Court, S.D. California.

Oct. 6, 1989.

Patricia A. Meyer, Aguirre & Meyer, San Diego, Cal., for plaintiff.

John E. McDermott, McDermott, Will & Emery, Los Angeles, Cal., for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RHOADES, District Judge.

Defendants' motion for summary judgment in the captioned case came before the Honorable John S. Rhoades, on April 17, 1989. Patricia A. Meyer, of Aguirre & Meyer, appeared on behalf of the plaintiffs and John E. McDermott, of McDermott, Will & Emery, appeared on behalf of the defendants. Based on the Court's oral statements from the bench, the motion for summary judgment is granted. This order summarizes the basis for the Court's ruling.

### I. INTRODUCTION

This case concerns the City of Chula Vista's at-large system for electing representatives to its City Council. Plaintiff alleges that the at-large system violates the rights of the City's Hispanic citizens under § 2 et seq. of the Voting Rights Act (42 U.S.C. § 1973 et seq.) and under the Fourteenth and Fifteenth Amendments to the United States Constitution. Plaintiff seeks an order requiring Chula Vista to elect its representatives from districts only.

In its motion for summary judgment, Chula Vista argues that plaintiff is foreclosed from relief by the United States Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Under *Thornburg*, a minority group challenging an at-large election system must prove that it is sufficiently large and compact to form a majority in a district if a single-member district system were used. *Id.* at 50–51, 106 S.Ct. at 2766. The City contends that plaintiff cannot prove this precondition and, consequently, that the complaint must be dismissed.

### II. THE STANDARDS APPLICABLE TO THE MOTION

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To establish a genuine factual issue, and thereby defeat the motion, the party opposing the motion must show more than some factual dispute. The question is whether "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

The Court must deny the motion if genuine factual issues are raised. In this regard, the Court also must construe the evidence in a manner that provides the non-moving party with all reasonable inferences that may be drawn from the evidence. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1299 (9th Cir.1982).

### III. STATEMENT OF FACTS

The City of Chula Vista uses an at-large electoral system to select the members of

its City Council. The at-large system allows every registered voter to participate in every councilmanic election, without regard to the voters' place of residence within the City. Thus, each voter has a say in the election of every candidate for office.

There are four City Council seats in the City, excluding the mayor, who also is elected citywide. City Council elections are held every two years at which time two of the four numbered seats on the Council are filled.

The racial and ethnic composition of the City of Chula Vista, based on 1980 boundaries and 1980 census data, is as follows:

| | |
|---|---|
| Anglo (non-Hispanic Whites) | 68.1% |
| Black (non-Hispanic) | 2.1% |
| Hispanic | 23.3% |
| Other (includes Asians, Pacific Islanders, American Indians) | 6.5% |

Using its current boundaries, Chula Vista has a total 1980 population of 107,000. Of this number, 26.5 percent are Hispanic. These statistics include the 1980 population of the so-called Montgomery area which was annexed to Chula Vista in 1985.

Chula Vista's expert demographer, Dr. Peter Morrison, evaluated the demography in Chula Vista to determine whether Hispanic persons or voters could form a majority in any district of a four district system given a best case compactness assumption. To estimate the hypothetical upper limit of geographic compactness among the entire Hispanic population in Chula Vista, Dr. Morrison combined the City's most heavily contiguous Hispanic census block groups into an area containing one-fourth of Chula Vista's total population. The ideal population for each district in a four district plan is 26,750.

For a district of 26,750 persons, Dr. Morrison estimated that no more than 42.7 percent would be Hispanic. When the factors of age and citizenship are considered, Hispanics who are eligible to vote constitute only 26.1% of the eligible voters in the hypothetical district.

Plaintiff's expert demographer, Dr. Bruce Cain, also conducted a demographic analysis. He was able to construct a 45.9% Hispanic population district assuming the use of four districts. By including all of the minorities in this hypothetical Hispanic district, he determined that the percentage of minorities in the district was 55% of the total population. Dr. Cain did not consider the factors of age or citizenship in his analysis.

Dr. Cain also reviewed population growth projections for 1990 by the U.S. Census, which showed that the Hispanic population has grown at a faster rate than the white population since 1980. He concluded that it is highly likely that the estimates of Hispanic population for the districts mentioned above are underestimates.

## IV. SECTION 2 OF THE VOTING RIGHTS ACT

### A. *In General*

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides that:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . . *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

By its terms, § 2 establishes a "results" test to determine whether minority voters' electoral power has been unlawfully diluted as a result of an electoral procedure. As a threshold to this analysis, however, the

United States Supreme Court has established three "necessary preconditions" for § 2 challenges to at-large electoral systems. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). Plaintiffs cannot succeed in § 2 challenges to at-large electoral systems unless they prove the existence of each of the three preconditions. *Gomez v. City of Watsonville,* 863 F.2d 1407, 1413 (9th Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); *McNeil v. Springfield Park District,* 851 F.2d 937, 939 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Collins v. City of Norfolk,* 816 F.2d 932, 935 (4th Cir.1987); *Buckanaga v. Sisseton Independent School District,* 804 F.2d 469, 472 (8th Cir.1986). If these preconditions are not met, there is no need to consider the presence of other factors within the totality of circumstances analysis. *McNeil,* 851 F.2d at 942.

Only the first of *Thornburg's* three preconditions is implicated by the City's motion. The first precondition requires the minority group to prove that it "is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the [at-large] form of the district cannot be responsible for minority voters' inability to elect its candidates." 478 U.S. at 50–51, 106 S.Ct. at 2766 (citations and footnotes omitted, alterations added). The *Thornburg* Court explained the purpose of this precondition as follows:

"The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representa-

tives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure."

478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17.

**B.** *The Minority Group's Potential To Elect*

■ The parties present sharply divided positions on the appropriate standard by which to measure the minority group's potential to elect. Plaintiff contends that the Court must measure the minority group's size by looking at total population figures. In contrast, the City contends that the Court must measure the group's size by looking at the number of eligible Hispanic voters (i.e., voting age citizens).

The *Thornburg* Court did not expressly resolve this issue. This Court finds, however, that the population of eligible voters appears to be the standard intended by the Supreme Court. The *Thornburg* Court established the first precondition for the purpose of determining whether the minority group has the ability to independently elect its own candidate. 478 U.S. at 50–51 & n. 17, 106 S.Ct. at 2766 & n. 17.

Looking at the question from another perspective, the express language of § 2 makes it clear that only "citizens of the United States" and "members of the electorate" are entitled to protection. 42 U.S.C. § 1973. As the Seventh Circuit held in *McNeil,* "those ineligible to vote have not experienced a dilution of their vote. They are not parties to a section 2 claim." 851 F.2d at 945.

In the *McNeil* case, for example, the black plaintiffs showed that the black population could form a 50.4% majority in a single-member park district and a 50.2% majority in a single-member school district. Plaintiffs argued that these population ma-

jorities satisfied *Thornburg*'s size requirement. *McNeil*, 851 F.2d at 944. The Seventh Circuit disagreed, however, because the use of simple population majorities undermines the *Thornburg* Court's emphasis on minority voters' "potential to elect candidates of their choice. Because only minorities of voting age can affect this potential, it is logical to assume that the Court intended the majority requirement to mean a voting age majority." *McNeil*, 851 F.2d at 945. The *McNeil* court also recognized that non-citizens must be excluded from the analysis. *Id.* (citing *Romero v. City of Pomona*, 665 F.Supp. 853, 854 (C.D.Cal. 1987), *aff'd*, 883 F.2d 1418 (9th Cir.1989) (excluding non-citizens from *Thornburg* size analysis)).

Based on this analysis, the Court concludes that plaintiffs must demonstrate that Hispanics could comprise the majority of the voting age citizens in one district of a district election system.

### C. *The Number Of Districts*

■ The parties also present sharply conflicting positions on the number of districts the Court must use to determine whether the minority group satisfies *Thornburg*'s first precondition. Plaintiff contends that the Court may increase the size of the City Council to a reasonable extent to make this determination and suggests an increase of one or two seats. In contrast, the City contends that the Court must use the number of districts under the challenged plan, which would be four districts in this case.

Plaintiff places strong emphasis on the Court's broad remedial powers in matters involving equitable remedies. The Court recognizes the breadth of its equitable powers, but finds the reasoning of the Seventh Circuit in *McNeil* persuasive. In addressing this issue, the Seventh Circuit held that:

"Although courts have broad remedial powers, plaintiffs must first show injustice. Here the purpose of the *Gingles* precondition is to determine, as a preliminary matter, whether [the electoral structure] illegally dilutes minority vot-

ing strength. Since we have found that it does not, we cannot fashion a remedy. Adding seats to the boards would create a voting rights violation where none presently exists by enabling appellants to meet the necessary precondition of their section 2 claim. This is a sort of bootstrapping we cannot accept."

851 F.2d at 946 (alterations added).

Where courts have changed the size of an elected body, they have done so with extreme caution. *McNeil*, 851 F.2d at 946–47; *Romero*, 665 F.Supp. at 864; *Sixty–Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 198–200, 92 S.Ct. 1477, 1484–1486, 32 L.Ed.2d 1 (1972). In *Beens*, a reapportionment case where a three-member district court reduced the size of Minnesota's State Senate by one-half and cut the size of Minnesota's House of Representatives by one-fourth, the Supreme Court strongly encouraged district courts to make no more than "minor deviations" in the size of state elective bodies. 406 U.S. at 198–200, 92 S.Ct. at 1484–1486.

Plaintiff cites *Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547 (11th Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), for the proposition that the Court has the authority to enlarge the size of an elected body to ensure that minorities will be able to elect candidates of their choice. *Carrollton*, however, involved the intentional decrease in membership in a county commission from five to three to one in order to hinder the ability of blacks, whose percentage in the county's voting age population had increased, to elect candidates of their choice. 829 F.2d at 1551. Because plaintiff has made no similar showing here, the Court believes that *Carrollton* is distinguishable on its facts.

Therefore, given the authorities cited above, the Court will not increase the size of the Chula Vista City Council. Any other result would create a violation of § 2 where one did not previously exist.

### D. *The One Man, One Vote Requirement*

The Court also recognizes that any plan minority voters submit must meet constitu-

tional standards; minority voters cannot violate the "one man, one vote" requirement to satisfy the *Thornburg* size prerequisite. *Romero,* 665 F.Supp. at 864; *see Reynolds v. Sims,* 377 U.S. 533, 567–68, 84 S.Ct. 1362, 1384–85, 12 L.Ed.2d 506 (1964). The Court may deviate by up to 10% in evaluating the population of a hypothetical district without violating the one man, one vote requirement. *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2695–2696, 77 L.Ed.2d 214 (1983).

### E. *The Evidence On Size And Compactness*

■ Based on 1980 Census data, Chula Vista's population is 107,000. Using a system comprised of four districts, the ideal population in each district would be 26,750. The City's expert found that the maximum Hispanic population district would be 42.7% Hispanic and plaintiff's expert found that it would be 45.9% Hispanic. The City's expert adjusted these total population figures by using Census data regarding age and citizenship. Use of these data show that when age and citizenship are considered, the 42.7% Hispanic population district only is 26.1% in voting age Hispanic citizens. According to the City's expert, this difference results from the sizable number of aliens in the Hispanic population in Chula Vista. Only in a district that is much smaller would the plaintiffs be able to satisfy the first prong of *Gingles.*

Accordingly, the Court finds that the 26.1% number is far too low to meet the first *Thornburg* precondition. This conclusion remains true even if the Court deviates from the equal population requirement by 10%.

### F. *Census Projections And Undercounts*

■ Plaintiff also argues that the Court should use 1987 estimates and future demographic trends rather than 1980 Census data. This argument was rejected by the Seventh Circuit in *McNeil,* which held that 1980 census data must be used unless someone comes forth with more reliable data. 851 F.2d at 946. The *McNeil* court

specifically rejected projections and estimates (as opposed to an enumeration which is what the Census conducts), such as those presented by Dr. Cain. The Seventh Circuit noted that the plaintiff there would have to wait until the 1990 Census data became available. *Id.*

Plaintiff also asserts that the Court should consider 1980 Census undercounts. This assertion is made by plaintiff's counsel not by plaintiff's expert, Dr. Cain. This assertion also was rejected in *Cuomo v. Baldridge,* 674 F.Supp. 1089, 1104–05 (S.D. N.Y.1987). As the City's expert points out, no factual or statistical basis exists for consideration of Census undercounting in any specific jurisdiction. Plaintiff's expert did not contradict this conclusion.

Accordingly, because plaintiff's arguments either prematurely consider the totality of the circumstances and are not based on the kind of concrete evidence necessary to override the presumption of accuracy of the census data, the court rejects the evidence concerning projections and undercounts.

### G. *Adding Other Minority Groups*

■ Plaintiff also argues that the Court should allow her to add all of Chula Vista's minority groups together into a single minority group for the purpose of considering *Thornburg's* first precondition. The Court does recognize that the minority group for a § 2 case may consist of members of two or more different minority groups. *Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). However, even if the Court allowed plaintiff to add Asians and blacks to the Hispanic group, the combined minority group could not satisfy the first *Thornburg* precondition.

■ As noted above, plaintiff's expert found that a maximum Hispanic population district would be 45.9% Hispanic. He then added other minorities to this maximum Hispanic district to derive a maximum minority population district of 55%. Thus, the other minorities make up 9.1% of the total population in this most heavily His-

panic district. Assuming that these other minorities also make up 9.1% of the voting age citizens in this district, minorities still would only comprise 35.2% of the voting age citizens. In order to form a majority of the eligible voters, this 9.1% of the district's total population would have to comprise 24% of the district's voting age citizens. This is a highly unlikely scenario and plaintiff has presented no evidence that this actually is the case in the hypothetical district.

The Court accordingly finds that it would accomplish nothing to allow plaintiff to amend the complaint by adding new minorities since such an amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

### H. *The Influence Claim*

■ Plaintiff's final argument is that Hispanics do not need to satisfy *Thornburg*'s first precondition at all. Plaintiff argues that the Court may grant relief if Hispanics have a high enough percentage of individuals, whether in terms of voting age citizens or total population, to influence an election. Plaintiff bases this argument on footnote 12 of the *Thornburg* opinion where the Court states that "We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections." 478 U.S. at 46–47 n. 12, 106 S.Ct. at 2764 n. 12.

The Supreme Court has not yet expanded on this concept and the Court is unwilling to do so here. This Court finds the Seventh Circuit's analysis in *McNeil* persuasive. The Seventh Circuit expressly rejected "influence" claims because the courts would be "flooded by the most marginal section 2 claims if plaintiffs had to show only that an electoral practice or procedure weakened their ability to influence elections." *McNeil,* 851 F.2d at 947.

Plaintiff has not cited any case recognizing an influence claim or finding a § 2 violation upon proof other than the three preconditions specified in *Thornburg.* The *Thornburg* trial court provided a persuasive explanation of why § 2 must be limited to proof of an impairment to elect:

"There is, first off, the fact that principle cases authoritatively developing the vote dilution concept have involved the impact of districting upon effective voting majorities. Confined to such measurable aggregations, the concept has a principled basis which permits rational and consistent, albeit sometimes difficult, application; not so confined, it lacks any such basis. That it to say, at the effective voting majority level it is possible to say with substantial assurance that to submerge or fracture such an aggregation in a racially polarized voting situation effectively deprives it of the presumptive capability to elect, solely by its group voting strength, representatives 'of its choice.' ... The raw power of such an aggregation 'to elect' provides a clear measure of its voting strength, hence a fair and workable standard by which to measure dilution of the strength. Short of that level, there is no such principled basis for gauging voting strength, hence dilution of that strength. Nothing but raw intuition could be drawn upon by courts to determine in the first place the size of those smaller aggregations having sufficient group voting strength to be capable of dilution in any legally meaningful sense and, beyond that, to give some substantive content other than raw power-to-elect to the concept as applied to such aggregations."

"We are doubtful that either the Supreme Court in developing the dilution concept, in constitutional voting rights litigation, or the Congress in embodying it in amended Section 2 of the Voting Rights Act intended an application openended as to voter group size. There must obviously be some size (as well as dispersion) limits on those aggregations of voters to whom the concept can be applied. We do not readily perceive the limit short of the effective voting majori-

ty level that can rationally be drawn and applied."

*Gingles v. Edmisten,* 590 F.Supp. 345, 381 (E.D.N.C.1984) (three judge panel), *aff'd in part, rev'd in part sub nom., Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *see also Latino Political Action Committee v. City of Boston,* 784 F.2d 409, 412 (1st Cir.1986) (rejecting influence claim because "it would require courts to make the very finest of political judgments about possibilities and effects— judgments well beyond their capacities").

The *Thornburg* preconditions for "election" cases give courts a measurable and judicially manageable test for determining the existence of unlawful vote dilution. Absent the requirement for a district majority, every segment of the population, no matter how small, would have a claim under § 2. Accordingly, the Court finds that there exists no legally cognizable "influence" claim under § 2 that would require a lesser standard of proof than set forth in *Thornburg.*

## V. THE FOURTEENTH AMENDMENT CLAIM

■ Plaintiff also challenges Chula Vista's at-large system under the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth below, the Court also finds that the equal protection claim must be dismissed.

Section one of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., 14th Amend., § 1. To succeed on the equal protection claim, plaintiff must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85 (1986) (citing *Mobile v. Bolden,* 446 U.S. 55, 67–68, 100 S.Ct. 1490, 1499–1500, 64 L.Ed.2d 47 (1980)); *Rogers v. Lodge,* 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982). Accordingly, when an at-large electoral system is challenged, the plaintiff must prove both that "(1) [the

at-large system] was adopted and/or maintained with the intent of purposefully discriminating against the minority voters, and (2) [the at-large system] result[s] in diluting minority votes." *Romero,* 665 F.Supp. at 868 (alterations added); *Terrazas v. Clements,* 581 F.Supp. 1329, 1342 (N.D.Tex.1984).

In its motion, the City argues that the effects prong of the equal protection claim is coextensive with the results test under § 2. According to the City, if plaintiff cannot establish that a dilutive result occurs under § 2, plaintiff's equal protection claim also fails. Plaintiff did not contest this argument and the Court finds it persuasive for the following reasons.

First, the two prong "intent, plus results" standard is more rigorous than the pure results test under § 2 of the Act. Indeed, it was because the intent, plus results standard imposed too great a burden on minority voters that Congress amended § 2. In *Thornburg,* the Court noted that:

> "The amendment was largely a response to this Court's plurality opinion in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had declared that, in order to establish a violation either of § 2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts before *Bolden....*"

*Thornburg,* 478 U.S. at 35, 106 S.Ct. at 2758; *see also id.* at 84, 106 S.Ct. at 2784 (O'Connor, J., Concurring in the Judgment) ("Whereas *Bolden* required members of a racial minority who alleged impairment of their voting strength to prove that the challenged electoral system was created or maintained with a discriminatory purpose and led to discriminatory results, under the

results test, 'plaintiffs may chose to establish discriminatory results without proving any kind of discriminatory purpose.' ")

It is clear that "section 2 of the Voting Rights Act demands a less exacting burden of proof." *Terrazas,* 581 F.Supp. at 1342. If plaintiff cannot satisfy the lesser of two standards, it follows that she cannot satisfy the greater.

Second, the *Thornburg* size and compactness analysis is as equally applicable to a Fourteenth Amendment analysis as it is to a § 2 analysis. The *Thornburg* size and compactness test defines, as a matter of law, minority voters' ability to link the at-large system to a voting related injury. At footnote 17 of the *Thornburg* decision, the Court wrote:

> "The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure."

478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17.

If minority voters lack sufficient size and concentration, this dilutive result cannot be established, just as it cannot be established under § 2 of the Voting Rights Act. The *Thornburg* Court's reasoning cannot be distinguished in this regard.

Because the voting age Hispanic citizen population is not large enough to constitute a majority in any district, the Court finds that plaintiff's Fourteenth Amendment claim also must be dismissed.

## VI. THE FIFTEENTH AMENDMENT CLAIM

Plaintiff's final claim is under the Fifteenth Amendment to the United States Constitution. The Fifteenth Amendment prohibits the denial to any citizen of the right to vote. It is not relevant to a question of racial vote dilution unless the claim concerns the purposeful denial of minority rights to register to vote and to cast ballots. *Mobile v. Bolden,* 446 U.S. 55, 65, 100 S.Ct. 1490, 1498–1499, 64 L.Ed.2d 47 (1980) ("Having found that Negroes in Mobile 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that appellants invaded the protection of that Amendment"); *Buchanan v. City of Jackson,* 708 F.2d 1066, 1069 (6th Cir.1983) ("Absent any allegation of actual interference in the voting or registration processes, plaintiffs have failed to state a claim under the Fifteenth Amendment"); *Romero,* 665 F.Supp. at 869. Even if the Fifteenth Amendment did apply to this case, the applicable standards would be the same as those under the Fourteenth Amendment, *McCarty v. Henson,* 749 F.2d 1134, 1136 (5th Cir.1984); *Romero,* 665 F.Supp. at 869, in which case plaintiff's Fifteenth Amendment claim suffers from the same infirmity as the Fourteenth Amendment claim. Thus, the Court finds that the Fifteenth Amendment claim also must be dismissed.

## VII. CONCLUSION

Based on the foregoing analysis, the Court hereby orders that defendants' motion for summary judgment is granted and that plaintiff's claims under § 2, the Fourteenth Amendment and the Fifteenth Amendment are dismissed.

IT IS SO ORDERED.