Tina C. DeBACA, James Miner, and Elena Anita Moreno, on behalf of themselves, and all others similarly situated, Plaintiffs,

v.

COUNTY OF SAN DIEGO, Norman Hickey, Chief Administrative Officer of San Diego County, Brian P. Bilbray, County Board of Supervisors, George F. Bailey, County Board of Supervisors, Susan M. Golding, County Board of Supervisors, Leon L. Williams, County Board of Supervisors, John MacDonald, County Board of Supervisors, Defendants.

Civ. No. 91–1282–R(M).

United States District Court, S.D. California.

May 11, 1992.

Michael A. Aguirre, Anders L. Johnson, Aguirre & Meyer, San Diego, Cal., for plaintiffs.

Ian Fan, Deputy County Counsel, County of San Diego, San Diego, Cal., John E. McDermott, Cadwalader, Wickersham & Taft, Los Angeles, Cal., for defendants.

ORDER GRANTING DEFENDANTS' MO-
    TION FOR SUMMARY JUDGMENT
    AND DENYING AS MOOT PLAIN-
    TIFFS' MOTIONS TO ENJOIN THE
    JUNE 2, 1992 ELECTION AND FOR
    CLASS CERTIFICATION

RHOADES, District Judge.

The plaintiffs, a Hispanic woman, an African–American man, and an Asian–American woman, have brought this class action alleging that the county's 1991 redistricting plan violates the rights of San Diego County Hispanic, African–American, and Asian–American citizens under the equal protec-

tion clause of the fourteenth amendment and under § 2 et seq. of the Voting Rights Act, 42 U.S.C. § 1973 et seq.[1] The plaintiffs move to certify their class and to enjoin the June 2, 1992 election for seats on the county Board of Supervisors. The defendants move for summary judgment. For reasons outlined below, I grant the defendants' motion for summary judgment and deny as moot the plaintiffs' motions to enjoin the June 2, 1992 election and to certify the plaintiff class.

## I. OVERARCHING LEGAL STANDARDS

Although the burdens and methods of proof are different for each of the instant motions, the underlying legal standards are substantially similar. The plaintiffs argue that the redistricting plan violates their rights for two primary reasons: because it evidences intentional discrimination that is prohibited by the equal protection clause, and because it dilutes their voting power under the "results" test set out in § 2 of the Voting Rights Act.[2] These arguments respectively are referred to as the constitutional claim and the § 2 claim. The legal standards for these claims are set out below.

It is important to understand the context in which these standards have been established. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.* at 561–62, 84 S.Ct. at 1381. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555, 84 S.Ct. at 1378.

As Chief Justice Warren noted in *Reynolds,* "history has seen a continuing expansion of the scope of the right of suffrage in this country." *Id.* Indeed, the scope of the right of suffrage has continued to expand since *Reynolds* was decided. The Voting Rights Act of 1965 and its amendments as well as the twenty-sixth amendment to the Constitution represent more recent expansions.

Given the importance of the right of suffrage, it is vital to protect the right of suffrage as effectively as possible. As Thomas Jefferson wrote, "I know of no safe depository of the ultimate powers of the society but the people themselves." *Letter from Thomas Jefferson to William Charles Jarvis* (Sept. 28, 1820). Because the judiciary is the least democratic of our three branches of government, there is an inherent danger in entrusting courts rather than elected legislative bodies with the responsibility of deciding public policy questions that relate to the protection of ultimate rights such as the right of suffrage.

Courts themselves have recognized this conflict in voting rights cases. Discussing the difficulty in weighing the political interests of two different minority groups that co-exist in the same community, one commentator wrote:

> Federal courts have recognized that these political questions do exist and that the best means to resolve them is in the process of give-and-take between citizens and their elected officials. Political ques-

---

**1.** The defendants argue that the plaintiffs have no standing to bring the instant action because the plaintiffs do not reside in the supermajority minority district that they seek to create. Because the plaintiffs seek a number of other remedies that might vindicate any injuries they might have suffered as minority citizens of San Diego County, I find that the plaintiffs have standing to bring the instant claim.

**2.** The plaintiffs also allege that the Board of Supervisors contains too few seats and that the redistricting plan enacted by the Board violates the one person-one vote rule of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). These allegations are addressed at the end of this Order.

tions necessarily require that policy choices be made before they can be resolved. This is not a task federal courts are equipped to handle. They have recognized their shortcomings in this area, and will, whenever possible, defer to legislative policy choices, even if the choice is perceived to be unwise or is simply not the optimum choice. If this process is ordered by federal courts, political questions which arise in aggregation cases will be decided by federal judges, whose private views of political wisdom will become the measure of the Constitution. This potential situation calls to mind Judge Wisdom's comment that, "[t]he least representative branch must take care when it reforms the most representative branch."

Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups—When is the Whole Greater than the Sum of the Parts?*, 20 Tex.Tech.L.Rev. 95, 124–25 (1989) (quoting *Marshall v. Edwards*, 582 F.2d 927, 934 (5th Cir.1978), *cert. denied sub nom. East Carroll Parish Police Jury v. Marshall*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979)) (other citations omitted).

One court has recognized a particularly pernicious possible result of judicial overreaching in voting rights cases. Facing a voting rights case that raised legal issues similar to those raised in the case at bar, the court in *Turner v. Arkansas*, 784 F.Supp. 553 (E.D.Ark.1991), wrote:

> The idea that race or ethnicity, or language, or religion might become the basis for distributing voters during the periodic redistricting process runs counter to our professed belief in the "oneness" of American political life and to the belief in Democracy itself with its emphasis on the individual citizen. There is no one coherent political philosophy, political principle or political program subsumed under such group labels as "black citizens," "white citizens," "Asian citizens," or "Hispanic citizens." Historically we Americans have opted to pursue the ideal of equal political opportunity for each individual citizen. The standard is "one

> person, one vote." When we speak in terms of "group political rights" for such categories of voters we are immediately in deep water, for so much of real political significance may be hidden under such group labels.

*Id.* at 562.

The case at bar raises many difficult questions that others wisely have found lie beyond the ambit of principled judicial decision-making. Certainly a federal court should not hesitate to act when the Constitution or an Act of Congress has been violated. But absent such a violation, a court best can safeguard the ultimate powers of society by allowing the people to speak through the democratic process.

### A. Constitutional Claim

■ To prove a constitutional violation, the plaintiffs must demonstrate the existence of a discriminatory purpose, *Garza v. County of Los Angeles*, 756 F.Supp. 1298, 1349 (C.D.Cal.), *aff'd in part and vacated and remanded in part*, 918 F.2d 763 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), and some injury resulting from the intentional discrimination, *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). Addressing the existence of intentional discrimination in the maintenance of an at-large voting system, the Supreme Court held that such systems violate the fourteenth amendment if they are "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982). Although intentional discrimination cannot be shown merely by demonstrating that a law

> affect[s] a greater proportion of one race than another ..., discriminatory intent need not be proved by direct evidence.... [A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears

more heavily on one race than another. Thus determining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

*Id.* at 618, 102 S.Ct. at 3276. As discussed below, the requirements for an injury showing are somewhat undefined.

### B. *Section 2 Claim*

Section 2 of the Voting Rights Act was amended in 1982 "to provide minority groups a remedy for vote dilution without requiring a showing that the majority engaged in intentional discrimination." *Garza,* 918 F.2d at 769–70. Instead of only reaching intentional discrimination, the amendment reaches discriminatory "results."

The 1982 amendment was construed in the context of multimember districts in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Gingles* set up three preconditions

for multimember districts to operate to impair minority voters' ability to elect representatives of their choice.... First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

*Id.* at 50–51, 106 S.Ct. at 2766–67 (citations omitted). Once these preconditions are met, the court must consider whether the results are discriminatory under a totality of the circumstances test. *See id.* at 43, 106 S.Ct. at 2762 (citing § 2(b) of the Voting Rights Act).

It is important to note that these legal standards were developed in cases that are factually distinguishable from the case at bar in two important ways. First, the case at bar involves redistricting of five single-member districts. By contrast, the *Gingles* standard for § 2 violations applies to multimember districts. The Supreme Court noted this distinction in *Gingles. See id.* at 47 n. 12, 106 S.Ct. at 2764 n. 12 ("We note ... that we have no occasion to consider whether the standards we apply to [the] claim that multimember districts operate to dilute the vote of [certain] geographically cohesive minority groups ... are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more ... single-member districts resulted in the dilution of the minority vote."). Second, the case at bar involves an allegation that three minority groups, *i.e.,* African–Americans, Hispanics, and Asian–Americans, should be treated as one cohesive minority group. By contrast, *Gingles* and most of the other cases cited rely on the existence of one cohesive racial minority. The plaintiffs "aggregate" African–Americans, Hispanics, and Asian–Americans for the purposes of both their constitutional and their § 2 claims.

## II. LEGAL STANDARDS FOR THE INSTANT MOTIONS

### A. *Injunctive Relief*

▮ The plaintiffs seek a preliminary injunction. To prevail on a request for preliminary injunctive relief, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the bal-

ance of hardships tips sharply in its favor. *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir. 1987); *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 753 (9th Cir.1982). These formulations are not different tests; they represent two points on a sliding scale in which the showing of irreparable harm must increase as the probability of success on the merits decreases. *Odessa Union*, 833 F.2d at 174. Under either standard, the moving party must demonstrate a significant threat of irreparable injury irrespective of the magnitude of the injury. *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). A district court also must consider the public interest as a factor in balancing the hardships when the public interest may be affected. *American Motorcyclist Association v. Watt*, 714 F.2d 962, 967 (9th Cir.1983).

### B. Summary Judgment

■ Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

■ In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). A moving party that does not bear the burden of proof at trial may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. The moving party is not required to produce evidence showing the absence of a genuine issue of

material fact on such issues, nor must the moving party support its motion with evidence negating the nonmoving party's claim. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990); *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 107 L.Ed.2d 20 (1989). Instead, " 'the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.' " *Lujan*, 110 S.Ct. at 3187 (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553).

■ Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. To make such a showing, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Such evidence need not be in a form admissible at trial to avoid summary judgment. *Id.* The moving party is entitled to judgment as a matter of law if the nonmovant fails to make a sufficient showing of an element of its case with respect to which it has the burden of proof. *Id.*

### C. Certification of Class

The prerequisites to a class action are that

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition, the class action must fit within one of three general types outlined in Rule 23(b).

The plaintiffs argue that their class action fits within the general type outlined in Rule 23(b)(2). Under this rule, a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Id.*

## III. SECTION 2 CLAIM

The parties have argued the § 2 claim in light of the Supreme Court's *Gingles* decision, which represented the Court's first attempt to construe the 1982 amendments to § 2. *Gingles* set forth three preconditions for bringing a § 2 claim in a multi-member district. As noted above, however, the *Gingles* Court specifically reserved the question whether the preconditions apply to a single-member district situation. *See Gingles,* 478 U.S. at 47 n. 12, 106 S.Ct. at 2764 n. 12. It therefore is necessary to examine briefly the scope of *Gingles* before analyzing the § 2 claims in the instant case.

A number of courts have addressed the applicability of the *Gingles* preconditions to single-member district cases in light of footnote 12. Two leading cases suggest that the *Gingles* preconditions do not apply in single-member district cases. In *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991), the court considered a challenge to a single-member districting plan even though the minority group at issue was not large enough to constitute a majority in one district. The *Armour* court suggested that this first *Gingles* precondition need not be met when the minority group challenges its

ability to *influence* an election. *See id.* at 1051–52.

The court in *Emison v. Growe,* 782 F.Supp. 427 (D.Minn.1992), cited *Armour* and also declined to apply the *Gingles* preconditions to a single-member district plan. The *Growe* court suggested that a strict application of *Gingles* is unnecessary in a single-member district challenge because the remedy of redrawing a district's boundaries is less drastic than the typical remedy in a multimember district challenge, *i.e.,* forcing a conversion to a single-member district plan. *See id.* at 436 n. 29.

Finally, the court in *Illinois Legislative Redistricting Commission v. LaPaille,* 782 F.Supp. 1272, 1275 (N.D.Ill.1992), followed *Armour* and noted that "[a]pplication of the three-part *Gingles* test in § 2 Voting Rights Act challenges to single-member district boundaries is questionable." The *LaPaille* court offered no additional analysis to support its rejection of the first *Gingles* precondition.

Other courts addressing this question have refused to follow *Armour* and its progeny. In *Hastert v. State Board of Elections,* 777 F.Supp. 634 (N.D.Ill.1991), the district court disagreed with *Armour* primarily by rejecting the concept that § 2 envisions both minority-controlled districts and "minority influence districts." *Id.* at 654. It recognized the Supreme Court's *dicta* in *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 2365 n. 24, 115 L.Ed.2d 348 (1991), which the *Armour* court had argued supported the "influence" concept. The *Hastert* court criticized *Armour's* reading of *Roemer,* however, and argued that the Court's failure to rule out the "influence" concept does not mean that "the Court will likely embrace this broad interpretation of § 2 without limitation in the future." *Hastert,* 777 F.Supp. at 652.

The *Hastert* court also noted that it was unable to perceive, as a matter of simple logic, a principled justification for waiving the minority voter majority requirement in single-member district cases while preserving it in multi-member or at-large district cases. The concerns animating the *Gingles* electoral majority

precondition for multi-member cases— concerns of proof and relief—reside equally in the single-member district context.

*Id.* Similarly, the court in *Williams v. City of Dallas,* 734 F.Supp. 1317, 1413 (N.D.Tex.1990), cited footnote 12 from the *Gingles* decision but concluded that "the legislative history of § 2 makes it clear that the same results test is to be applied in both at-large and single-district challenges."

▇▇ The *Hastert* rule is the better rule. *Armour* does not argue that *Gingles* is more apposite in a multi-member system than in a single-member system, but argues instead that the ability of minority groups to influence elections should be protected. This court rejected the "influence" concept in *Skorepa v. City of Chula Vista,* 723 F.Supp. 1384, 1391 (S.D.Cal.1989) (relying on *McNeil v. Springfield Park District,* 851 F.2d 937 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989)). Although *Skorepa* was decided before *Chisom,* I adopt the *Hastert* court's reading of *Chisom* and reject the *Armour* court's reading.

Moreover, the plaintiffs have not seriously argued that they are entitled to relief under an "influence" theory in the instant case. The justification for the *Armour* rule is absent in this case, and the *Gingles* preconditions apply.

▇▇ The plaintiffs seek a judicial determination that District 4 and the entire redistricting plan as currently drawn violate their § 2 rights by diluting their votes. Applying the *Gingles* preconditions, the plaintiffs must demonstrate that (1) their minority groups are sufficiently large and geographically compact to constitute a majority in a redrawn district; (2) their minority groups in District 4 are politically cohesive; and (3) the white majority in District 4 votes sufficiently as a bloc to enable it usually to defeat their preferred candidate.

As a preliminary matter, the plaintiffs concede that Hispanics alone cannot have numbers sufficient to meet the *Gingles* preconditions. *See Declaration of J. Morgan Kousser in Support of Plaintiffs' Motion to Enjoin* at 5, para. 7. Thus the plaintiffs have premised their § 2 claim on their theory that African–Americans, Hispanics, and Asian–Americans together constitute one minority group for voting purposes. The plaintiffs' § 2 claim will be analyzed under this so-called "aggregation" theory.[3]

▇▇ Turning to the first *Gingles* precondition, it is uncontested that the aggregated San Diego County African–American, Hispanic, and Asian–American communities are sufficiently large and geographically compact to constitute a majority in a redrawn district. The plaintiffs propose a district in which African–Americans, Hispanics, and Asian–Americans account for 73.84% of the total population. *See Plaintiffs' Exhibit Z.* These groups account for 69.16% of the voting age population in the proposed district, *see Plaintiffs' Exhibit AA,* and 65.78% of the "eligible voter population" in the proposed district, *see Plaintiffs' Exhibit BB.* By any measure, African–Americans, Hispanics, and Asian–Americans constitute a majority of the proposed district's population.

The defendants respond that the proposed district, with 445,517 persons, is smaller by 54,086 persons than the 499,-603–person ideal population for a district. *See Peter A. Morrison Declaration* at 2, para. 5. It is unclear what figures Dr. Morrison used in finding a total population of 445,517 for the proposed district; according to *Plaintiffs' Exhibit Z,* the total population of the proposed district is 481,-281. The *Exhibit Z* total population figure is just 3.7% or 18,482 persons shy of the ideal population Dr. Morrison identified. The districts as adopted by the Board of Supervisors have total populations ranging from 476,015 to 524,476. *See Plaintiffs'*

---

**3.** The Ninth Circuit has not explicitly approved aggregation of several minority groups to meet the *Gingles* preconditions, but has acknowledged without comment that a trial court had received evidence that "blacks and Hispanics are politically cohesive." *See Romero v. City of Pomona,* 883 F.2d 1418, 1423 (9th Cir.1989).

*Exhibit Y.* The proposed district is not too small, and the plaintiffs have met the first *Gingles* precondition.

The final two *Gingles* preconditions require an inquiry into the existence of racially polarized voting in the district. *See Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. The *Gingles* Court noted that the test for racially polarized voting would vary from case to case, but set out several considerations:

> A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting.

*Id.* (citations omitted). The Court also noted that

> [b]ecause loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest.

*Id.* at 57, 106 S.Ct. at 2769–70 (citations omitted). Expanding on this standard, the Ninth Circuit has held that "the issue of political cohesiveness is to be judged primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville,* 863 F.2d 1407, 1415 (9th Cir.1988). The district court should not look beyond actual voting patterns. *See id.* at 1416.

The plaintiffs are not able to show that African–Americans, Hispanics, and Asian–Americans constitute one politically-cohesive minority group, which is the second *Gingles* precondition. The plaintiffs rely heavily on "results" in the 1988 Jackson–Dukakis presidential primary election and in the 1988 Bradley–Deukmejian gubernatorial election.[4]

Several assumptions underlie the plaintiffs' analysis of the Jackson–Dukakis and Bradley–Deukmejian elections. First, the plaintiffs assume that Jackson and Bradley were the respective choices of the united minority community. Second, the plaintiffs assume that the differences between the outcomes of these races in District 4 and in the proposed district are due to the decreased influence of the white voting bloc in the proposed district.

The plaintiffs' analysis of the 1988 elections is inconclusive at best. Dr. Arthur Lupia, the plaintiffs' expert on voting polarization, indicated that his analysis is "very preliminary." *Exhibit A to March 23, 1992 Declaration of Arthur Lupia* at 1. Dr. Lupia only was able to say that the analysis "does not rule out the possibility that there exists a high degree of cohesiveness between the African–American and Hispanic communities." *Id.* Dr. Lupia reiterated this position in his deposition. *See April 23, 1992 Deposition of Arthur Lupia* at 43–44 ("Q: Would it be fair to say that as you sit here today, you can't state that blacks and Hispanics were cohesive in these two elections? A: That—that would be fair to say. Q: And I gather it also

---

**4.** The plaintiffs also rely on statements made by Supervisor Williams regarding his support from Hispanic and Asian–American voters and his support of and from Hispanic candidates. Supervisor Williams's comments, however, are only anecdotal and are not probative of "voting preferences expressed in actual elections."

would be fair to say that you can't state that blacks and Hispanics are cohesive and vote cohesively in the more general sense in elections in San Diego County?  A:  That's correct.").

The Dukakis–Jackson race does not support the plaintiffs' claim that the minority community is united.  In fact, it appears that the Hispanic community tended to support Dukakis, while the African–American community tended to support Jackson.  Although Dr. Lupia noted that African–Americans seemed to vote the same as Hispanics and "everybody else," he noted that " 'votes for Dukakis' were more likely in areas with greater Hispanic population and lower in areas with greater African–American population." *March 23, 1992 Lupia Declaration* at 5.

Dr. Morrison's declaration supports a finding that African–Americans and Hispanics did not cohesively support Jackson. Dr. Morrison hypothesized that Jackson lost in District 4 yet would have won in the proposed district because, given that relatively fewer Hispanics vote, African–Americans would overwhelm Hispanics who supported Dukakis in the proposed district. *Declaration of Peter Morrison* (undated; filed March 23, 1992).  Dr. Morrison later expanded on this hypothesis by noting that Dukakis beat Jackson in census tracts with high or very high Hispanic voting age populations and very low African–American voting age populations. *See April 24, 1992 Declaration of Peter Morrison* para. 3.

Dr. Klein also found that results in the Dukakis–Jackson election did not support a finding of cohesiveness.  Dr. Klein relied on exit polls that he said showed that "Hispanics strongly preferred Dukakis while Blacks overwhelmingly supported Jackson." *See April 23, 1992 Declaration of Stephen Klein* at 3.  He also found that Asian–Americans preferred Dukakis. *See March 20, 1992 Declaration of Stephen Klein* at 1.  Dr. Klein's polling data were

collected statewide, nationwide, and in Stockton, California.[5]

Based on the foregoing analyses, the Dukakis–Jackson race does not support a finding that African–Americans and Hispanics vote cohesively.  At best, there is no complete analysis concerning who Hispanics supported in this race.  At worst, at least from the plaintiffs' point of view, the data suggest that Hispanics generally supported Dukakis and that African–Americans generally supported Jackson.

This leaves the plaintiffs with the Deukmejian–Bradley race as the only election they offer to show that African–Americans, Hispanics, and Asian–Americans vote as a cohesive bloc.  As a preliminary matter, it is important to note that the *Gingles* Court expressly disapproved of reliance on a single election. *See Gingles*, 478 U.S. at 57, 106 S.Ct. at 2769 ("[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election.").

It also is important to acknowledge that the plaintiffs' expert, Dr. Lupia, admitted that he could not determine whether a majority of Hispanics supported Deukmejian or Bradley. *See April 23, 1992 Deposition of Arthur Lupia* at 16–17.  Dr. Lupia only concluded that in the Bradley–Deukmejian election there may have been a significant difference between the votes of Republicans on the one hand and the votes of African–Americans, Hispanics, and "everybody else" on the other hand. *See March 23, 1992 Declaration of Arthur Lupia* at 8–9.  Dr. Lupia also suggested that "Hispanics were a bit more likely to support Deukmejian than were African–Americans." *Id.*

Dr. Klein rejected Dr. Lupia's admittedly inconclusive findings regarding the Bradley–Deukmejian race by arguing that Dr. Lupia had assumed that "all Republicans

---

**5.** In his deposition, Dr. Lupia suggested that exit polling data might be inaccurate, but did not specifically discuss the data used in this case. *See April 23, 1992 Deposition of Arthur Lupia* at 44–48.  The defendants also submitted a declaration of Francine Rabinovitz that discussed polling data obtained during the Jackson–Dukakis election.  Rabinovitz essentially reached the same conclusion as had Klein.

are not African or Hispanic." *April 23, 1992 Declaration of Stephen Klein* at 5. Dr. Klein wrote that Dr. Lupia's assumption is "absurd" given Dr. Klein's own evidence that "about 40 percent of San Diego's registered Hispanics are Republicans." *Id.* In his most recent declaration, Dr. Lupia characterized Dr. Klein's April 23, 1992 criticisms as generally valid. *See Declaration of Arthur Lupia* at 4 (undated; filed May 4, 1992).

A review of the foregoing analyses reveals that the plaintiffs have not put forth evidence supporting their argument that African–Americans, Hispanics, and Asian–Americans form a cohesive voting bloc. The plaintiffs have suggested that a voting bloc can be demonstrated in the results of two specific elections, but have admitted that their current understanding of these elections at best is inconclusive. In fact, there is no evidence to suggest that the minorities voted as a bloc in the one of these races, the Jackson–Dukakis race. The evidence concerning the Bradley–Deukmejian race is merely inconclusive.

Revisiting the *Gingles* opinion, the Court recognized that the number of elections that must be analyzed to show polarized voting "will vary according to pertinent circumstances." *Gingles,* 478 U.S. at 57 n. 25, 106 S.Ct. at 2769–70 n. 25. It even is possible that statistics from just one election could support a vote dilution claim. *Id.* In the case at bar, however, the plaintiffs have not demonstrated minority bloc voting even in one election. The plaintiffs have developed no evidence to meet the second *Gingles* precondition. Absent a finding sufficient to satisfy *Gingles,* it would be presumptuous or worse for a federal court to find that minority groups are interchangeable for § 2 purposes as the plaintiffs allege. Indeed, absent a violation of § 2, this case raises precisely the sort of question that is better left to the people

acting through their elected representatives.

Turning finally to the third *Gingles* precondition, the plaintiffs must demonstrate that whites vote as a bloc to defeat the minority's chosen candidate. It is logically impossible to analyze this precondition in the two elections put forth by the plaintiffs because the plaintiffs have not demonstrated who the aggregated minority's chosen candidate is. The plaintiffs offer no other evidence that whites vote as a bloc to defeat the minority's choice.

Perhaps the only races alluded to in the record that may be probative of this precondition are Supervisor Williams's own races in the Fourth District. Supervisor Williams, an African–American, has been elected more than once in the Fourth District. It is undisputed that whites constitute a majority of the voting age population in this district. *See Plaintiffs' Exhibit X.* Assuming without deciding that Supervisor Williams is the candidate of choice of the minority group the plaintiffs seeks to create through aggregation, the white majority has not voted as a bloc to defeat this choice. The plaintiffs have failed to demonstrate the existence of the third *Gingles* precondition.

The evidence that the plaintiffs have *not* put forth is as significant as what they have put forth. The plaintiffs have not analyzed any local elections.[6] They have not analyzed any non-partisan races. Although the *Gingles* Court left somewhat open the proof necessary to demonstrate the existence of racially polarized voting, I cannot find, based on any reasonable standard of proof, that the plaintiffs' current evidence is sufficient to meet the three *Gingles* preconditions. I therefore find that the plaintiffs' § 2 claim fails as a matter of law. The defendants' motion for

---

**6.** *See April 10, 1992 Declaration of J. Morgan Kousser* at 12 ("Up to the present, neither side has presented analyses of cohesion or polarization in any local San Diego election."). Dr. Kousser mentioned a number of elections that could be analyzed, including: (1) the 1970 supervisorial election between Jim Bear, an Anglo, and George Smith, an African–American; and

(2) the 1972 election involving Lou Conde, about whose race the parties disagree. Of course, the race of a candidate may not be particularly relevant in determining whether the candidate is the choice of a minority group. *See Gingles,* 478 U.S. at 67–70, 106 S.Ct. at 2775–76 (opinion of Justice Brennan).

summary judgment on this ground is GRANTED.

## IV.  CONSTITUTIONAL CLAIM

As noted above, to prove a constitutional violation, the plaintiffs must demonstrate the existence of a discriminatory purpose, *Garza,* 756 F.Supp. at 1349, and some injury resulting from the intentional discrimination, *Garza,* 918 F.2d at 771.  This standard essentially echoes the standard suggested by Justice White's opinion, joined by Justices Brennan, Marshall, and Blackmun, in *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85 (1986): "[I]n order to succeed the ... plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."  Justice White's immediate reference to *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), indicates that the same rule applies to identifiable racial groups.

Although written in the context of political discrimination and not racial discrimination, Justice White's *Davis* opinion offers a detailed discussion of the elements of a discrimination claim and of the justification for these elements.  Justice White began by reiterating that single-member district elections are not unconstitutional merely because supporters of losing candidates have no seats assigned to them.  *Davis,* 478 U.S. at 130, 106 S.Ct. at 2809 (White, J.).  Justice White summarized the Court's earlier cases involving racial discrimination in individual districts by noting that

> we have required a substantially greater showing of adverse effects than a mere lack of proportional representation to support a finding of unconstitutional vote dilution.  Only where there is evidence that excluded groups have less opportunity to participate in the political processes and to elect candidates of their choice have we refused to approve the use of multimember districts.  In these cases, we have also noted the lack of responsiveness to those elected to the concerns of the relevant groups.

> These holdings rest on a conviction that the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm.  This conviction, in turn, stems from a perception that the power to influence the political process is not limited to winning elections.  An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district.  We cannot presume in such a situation, without actual proof to the contrary, that the candidate elected will entirely ignore the interests of those voters.

*Id.* at 131–32, 106 S.Ct. at 2809–10 (quotations and citations omitted).

In an attempt to satisfy the Supreme Court's intentional discrimination standard, the complaint in the case at bar alleges:

> 28.  Defendant COUNTY OF SAN DIEGO has intentionally used the election system as a device to discriminate against SAN DIEGO MINORITY CITIZENS by minimizing, cancelling out and diluting the voting strength of SAN DIEGO MINORITY CITIZENS.  This intentional conduct by Defendant COUNTY OF SAN DIEGO has resulted in the denial and abridgement of the right of SAN DIEGO MINORITY CITIZENS to vote.  It has further resulted in closing the political processes leading to the nomination and election of SAN DIEGO MINORITY CITIZENS to the San Diego County Board of Supervisors.  Upon these premises SAN DIEGO MINORITY CITIZENS have less opportunity, than do other members of the electorate, to fully participate in the political process and to elect a representative of their choice.

> 29.  On September 16, 1991, the County of San Diego Board of Supervisors intentionally reapportioned the supervisorial district so as to divide the San Diego Hispanic American Areas, from each other as well as from the San Diego Afro–American Areas, and the San Diego

Asian American Areas. Said districts were drawn with the intent of fragmenting or fracturing the voting power of SAN DIEGO MINORITY CITIZENS.

30. The fragmentation of the San Diego Hispanic populations was effectuated for the purpose and with the result of diluting the hispanic population between two districts thereby allowing the white bloc vote to over power the voting strength of the hispanics.

*Complaint* paras. 28–30. The complaint further alleges:

The Defendant COUNTY OF SAN DIEGO's redistricting plan ensured that the white bloc vote majority will continue to elect all members to the Board of Supervisors while plaintiffs and their class will continue to have *neither the opportunity to be elected, nor the chance to elect a representative* of their choice, all in violation of the Fourteenth Amendment to the United States Constitution....

*Id.* para. 60 (emphasis in original).

The plaintiffs have alleged intentional discrimination against "San Diego minority citizens" and an actual discriminatory effect on that group. The plaintiffs' proof on this issue, however, does not support a finding that African–Americans, Hispanics, and Asian–Americans were discriminated against as a group. In his April 10, 1992 Declaration, Dr. Kousser stated his "very tentative conclusion" that the 1991 redistricting plan was drawn "with an intent to fragment the Latino community, thereby denying *that* community a fair opportunity to elect candidates of its choice." *April 10, 1992 Declaration of J. Morgan Kousser* at 2 (emphasis added).

Dr. Kousser's entire theory hinges on the proposition that the Board of Supervisors, which includes Supervisor Williams, an African–American, chose to preserve African–American influence at the expense of Latino influence. In his deposition, Dr. Kousser agreed that he had not concluded that the Board discriminated against African–Americans. *See April 21, 1992 Deposition of J. Morgan Kousser* at 30, lines 13–16. Dr. Kousser also did not conclude that

Asian–Americans had been the target of any discriminatory intent. *See id.* at 32, lines 2–5.[7] Finally, Dr. Kousser acknowledged that minority groups fought against each other regarding the redistricting plan. *See id.* at 45, lines 22–25, and 46, lines 1–5.

Although the complaint in paragraph 30 discusses the effect of the redistricting plan on the voting strength of Hispanics, the focus of the complaint and of the evidence presented in this case has been discrimination directed at San Diego minority citizens. The plaintiffs cannot show that San Diego minority citizens as a group were the object of discrimination in the redistricting process. There is no evidence suggesting discriminatory intent against Asian–Americans.

The plaintiffs argue in their opposition to the defendants' summary judgment motion that the elimination of African–Americans is not fatal to their case. Certainly African–Americans need not be included in a constitutional discrimination claim brought on behalf of San Diego County Hispanic citizens, but it is just as certain that the plaintiffs have not brought such a claim in the case at bar. Rather the plaintiffs, a proposed class of African–Americans, Hispanics, and Asian–Americans, throughout their complaint allege that the rights of San Diego minority citizens have been violated. The plaintiffs in their prayer seek to vindicate the rights of San Diego minority citizens. Yet the plaintiffs have introduced no evidence suggesting that the rights of San Diego minority citizens have been violated as alleged. The defendants are entitled to summary judgment on this ground.

It is important to recognize that, as the defendants themselves have argued, whether Hispanics can raise a constitutional claim is not before the court in the case at bar. Although I am not called on to decide whether sufficient evidence is before me to withstand summary judgment on a constitutional claim brought by Hispanics standing alone, I note that there is some evidence in the record suggesting that Hispanics could meet the "intent" part of the

7. Dr. Kousser also noted that "the evidence is    really very sparse." *Id.* at 32, line 21.

test for a constitutional violation. Nonetheless, I call attention to Dr. Kousser's statement that the evidence adduced to date is "too sparse" to support a finding of discriminatory intent. *See Deposition of J. Morgan Kousser* at 29–30. I also note the absence of a coherent standard for analyzing discriminatory intent when the interests of two competing minority groups might have been weighed.

The plaintiffs have not offered proof of specific injury to Hispanic voters, and this question has not been presented in the instant case. In fact, the standard as to the "injury" part of the test for a constitutional violation is more difficult to analyze than the "intent" part. The *Garza* court noted that "[a]lthough the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases, *some* showing of injury must be made to assure that the district court can impose a meaningful remedy." *Garza,* 918 F.2d at 771 (emphasis in original). The *Garza* court cited language from § 2(b) of the Voting Rights Act and from *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), in setting up its injury standard. *White* required a showing that "the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Garza,* 918 F.2d at 771 (citing *White,* 412 U.S. at 766, 93 S.Ct. at 2339).

The *Garza* court did not specifically indicate what evidence it relied on in finding injury. It merely stated that "the supervisors' intentional splitting of the Hispanic core resulted in a situation in which Hispanics had less opportunity than did other county residents to participate in the political process and to elect legislators of their choice." *Id.* The *Garza* court made it clear that plaintiffs need not show that they could constitute a majority in a redrawn district in order to demonstrate an injury. *See id.* at 769, 93 S.Ct. at 2341. Whether the final two *Gingles* precondi-

tions are relevant to determining an injury is an open question.

Justice White's *Davis* opinion sets out one possible framework for determining whether plaintiffs in a districting case have sustained a constitutional injury. It is worth noting, however, that Justice O'Connor's concurring opinion in *Davis* assails Justice White's standard as being too broad as applied in that political discrimination case. Her opinion hints that Justice White's standard also may be too broad for deciding racial discrimination cases because it will lead to a proportional representation requirement, which the Voting Rights Act expressly rejects. *See* 42 U.S.C. § 1973(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); *Davis,* 478 U.S. at 145, 106 S.Ct. at 2816–17 (O'Connor, J., concurring in the judgment).

The court in *Turner* expressed succinctly a danger of proportional representation. Writing in a racial districting case, the court noted:

This case carries the effort to concentrate black voters into fewer and fewer districts a step beyond that already taken in [an earlier case in this district]. If successful, it would leave our nation but one short step removed from a system of representative government based on race, ethnic origin and language, (is religion next?), in which system district lines would be irrelevant. We would then end up with a system of pure proportionate representation predicated upon factors that should be completely irrelevant in the political life of a democratic society.

*Turner,* 784 F.Supp. at 558. For this reason, Justice O'Connor's words in *Davis* bear repeating. On the subject of proportional representation as raised in a political discrimination case, she wrote:

It is predictable that the courts will respond by moving away from the nebulous standard a plurality of the court [led by Justice White] fashions today and toward some form of rough proportional representation for all political groups. The consequences of this shift will be as

immense as they are unfortunate. I do not believe, and the Court offers not a shred of evidence to suggest, that the Framers of the Constitution intended the judicial power to encompass the making of such fundamental choices about how this Nation is to be governed. Nor do I believe that the proportional representation towards which the Court's expansion of equal protection doctrine will lead is consistent with our history, our traditions, or our political institutions.

.... In cases such as this one, which may profoundly affect the governance of this Nation, it is not enough to cite precedent: we should examine it for possible limits, and if they are lacking, for possible flaws.

*Davis,* 478 U.S. at 145–46, 106 S.Ct. at 2817.

Whether Justice O'Connor's opinion regarding constitutional injury and proportional representation in a political discrimination case applies with equal force in a racial discrimination case is not before the court today. Questions regarding the nature of a cognizable injury will arise, however, should the Hispanic plaintiffs someday bring a constitutional discrimination claim on their own behalf.

■ The issue before the court today—whether the Board intentionally discriminated against the group of African–Americans, Hispanics, and Asian–Americans defined by the plaintiffs as "San Diego minority citizens"—can be decided on a motion for summary judgment. Because the plaintiffs have presented no evidence of discrimination against African–Americans and Asian–Americans, the plaintiffs' discrimination claim as brought by the plaintiffs on behalf of San Diego minority citizens as a group must fail. The defendants' motion for summary judgment on this ground is GRANTED.

## V. ONE PERSON–ONE VOTE CLAIM

The plaintiffs allege that the redistricting scheme violates the one person-one vote rule as defined in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). As the defendants note, however,

the Supreme Court has approved a state reapportionment resulting in a 9.9% population differential between the ideal district and a challenged district. *See White v. Regester,* 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973). The defendants argue that "[i]t is undisputed that the County's plan has a total population deviation from the ideal of 9.9%." *Defendants' Motion for Summary Judgment* at 23, lines 13–14.

The plaintiffs have responded that data that might demonstrate a one person-one vote violation are not yet available. *See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* at 25. The plaintiffs also suggest that the court must defer ruling on this issue until all evidence relating to the "present reality," *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763, is available. *See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* at 25. The plaintiffs have cited no authority stating that a district court may not grant summary judgment solely because it is possible that evidence to support the claim someday might exist. There is no evidence before the court to indicate that the defendants have violated the one person-one vote rule. The defendants' motion for summary judgment on this ground is GRANTED.

## VI. CONCLUSION

*Gingles* does not require a district court to wait for evidence that someday might be presented to it before deciding a motion for summary judgment. As the Supreme Court noted in *Lujan* and *Celotex,* the court should grant summary judgment motion "so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Lujan,* 110 S.Ct. at 3187 (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

I do not fault the plaintiffs for bringing the instant case. Citizens should not be timorous in seeking to vindicate their rights, particularly rights as fundamental as the right to vote and particularly when, as in the case at bar, the law mostly is uncharted territory. Nonetheless, I am

called upon to decide this case based on the law as I understand it and the evidence before me.

Based on the evidence before the court, I find an absence of evidence to support the existence of the second and third *Gingles* preconditions. Thus the defendants are entitled to summary judgment on the plaintiffs' § 2 claim. I find an absence of evidence to support a claim of intentional discrimination against all San Diego African–American, Hispanic, and Asian–American citizens as a group. Thus the defendants are entitled to summary judgment on the plaintiffs' constitutional claim. I find an absence of evidence to support the plaintiffs' one person-one vote claim, and the defendants are entitled to summary judgment on this claim. Because the defendants are not liable for any violation, I need not consider whether any particular remedy, such as increasing the size of the Board of Supervisors, is appropriate.

To the extent that they are able to avoid the preclusive effect of this Order, the plaintiffs later might be able to demonstrate a violation of their rights under § 2. This case has not reached the question whether the constitutional rights of plaintiff DeBaca and other San Diego County Hispanic citizens have been violated.

The defendants' motion for summary judgment is GRANTED. The plaintiffs' motion to enjoin the June 2, 1992 election is DENIED AS MOOT. The plaintiffs' motion for class certification is DENIED AS MOOT.

IT IS SO ORDERED.